Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:13-CV-00021-BO

C O P Y

AMEC ENVIRONMENT & INFRASTRUCTURE, )
INC. f/k/a AMEC EARTH &            )
ENVIRONMENTAL, INC.,               )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )        D E P O S I T I O N
                                   )
STRUCTURAL ASSOCIATES, INC., and   )
TALON INDUSTRIES, INC.,            )
                                   )
                Defendants.        )
 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

JEFFREY ALAN PFAENDTNER

One West Fourth Street
Winston-Salem, North Carolina

Wednesday, April 30, 2014
10:08 o'clock a.m.

Atlantic Professional Reporters
Winston-Salem, NC  27116-1672

Case 7:13-cv-00021-BO   Document 71-3   Filed 06/12/14   Page 2 of 20

**Page 2**

NOTES

Page:Line    Subject Matter    Relates To    Action

**Page 4**

## I N D E X

STIPULATIONS     5

EXAMINATION
Ms. Gavalier     6

ADJOURNMENT     150
CERTIFICATE OF TRANSCRIPT     151
CERTIFICATE OF OATH     152
WITNESS CERTIFICATE     153
WITNESS ADDENDUM     154
CERTIFICATE OF MAILING     155

## E X H I B I T S

| Name | Offered By | Identified |
| --- | --- | --- |
| Deposition Exhibit 1 | Plaintiff | 7 |
| Deposition Exhibit 2 | Plaintiff | 13 |
| Deposition Exhibit 3 | Plaintiff | 62 |
| Deposition Exhibit 4 | Plaintiff | 111 |
| Deposition Exhibit 5 | Plaintiff | 115 |
| Deposition Exhibit 6 | Plaintiff | 136 |

**Page 3**

## APPEARANCES OF COUNSEL

Jonathan Reid Reich, Esq.
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One West Fourth Street
Winston-Salem, North Carolina 27101

Kristi Gavalier, Esq.
BROWN LAW LLP
4130 Park Lake Avenue, Suite 130
Raleigh, North Carolina 27612

OTHER APPEARANCES

**Page 5**

STIPULATIONS

Pursuant to notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated before Connie B. Meeker, Notary Public in and for the County of Guilford, State of North Carolina at Large.

The deposition was conducted for use in accordance with and pursuant to the applicable rules or by order of any court of competent jurisdiction.

Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

Case 7:13-cv-00021-BO   Document 71-3   Filed 06/12/14   Page 3 of 20

Page 6

1      The witness, JEFFREY ALAN PFAENDTNER, being
2  first duly sworn to state the truth, the whole truth
3  and nothing but the truth, testified as follows:
4      (10:08 o'clock a.m.)
5              EXAMINATION
6  BY MS. GAVALIER:
7      Q.  Good morning, Mr. Pfaendtner.
8      A.  Good morning.
9      Q.  We just met off the record.  My name is
10  Kristi Gavalier, and I'm here on behalf of Amec and
11  Zurich.  I appreciate you being here today.
12          Have you ever been deposed before?
13      A.  Yes.
14      Q.  Okay, how many times?
15      A.  I think this about my tenth time.
16      Q.  Okay, so I imagine that you are familiar
17  with the general procedures, but just to make sure
18  that everything goes as well as it can today, I'll
19  just hit a few items.
20          As you know, we're being recorded.  And so
21  in order to have a clean transcript, if we can do our
22  best not talk over one another ---
23      A.  --- Okay.
24      Q.  --- That will be helpful to the court
25  reporter.

Page 7

1          Also if you can answer in the affirmative
2  like you just did, indicating okay as opposed to
3  using phrases or terms we may use in casual
4  conversation.
5      A.  Okay.
6      Q.  If you need a break at any time just let
7  me know.  I just ask that if there's a question
8  pending you go ahead and answer that question.
9      A.  Okay.
10      Q.  And if I ask a question that you do not
11  understand or would like clarification, please let me
12  know and I'm happy to try to provide that to you.
13      A.  Sounds good.
14      Q.  Okay.  And, Mr. Pfaendtner, will you state
15  your full name for the record, please.
16      A.  It's Jeffrey Alan Pfaendtner.
17      Q.  And will you state your date of birth,
18  please.
19      A.  February 28th, 1967.
20      Q.  And will you state your business address,
21  please.
22      A.  2355 Polaris Lane North in Plymouth,
23  Minnesota.
24          (* Exhibit 1 was marked *)
25      Q.  Mr. Pfaendtner, I'm going to show you

Page 8

1  what's been marked as Exhibit 1.  This is your notice
2  of deposition.
3          Have you seen this document before?
4      A.  I saw it in my client's office yesterday,
5  but I -- I don't have a copy of it.
6      Q.  Are you here testifying pursuant to that
7  notice of deposition today?
8      A.  Yes.
9      Q.  Okay, you can set that aside.
10          Mr. Pfaendtner, what did you do to prepare
11  for your deposition today?
12      A.  I reviewed my file.
13      Q.  Okay, and you gave me a copy of your file
14  right before your deposition began.  Correct?
15      A.  I did, on a flash drive.
16      Q.  And I will hopefully have an opportunity
17  today to glance through that file to see what it
18  contains, but can you give me generally the items
19  that you have in your file that you reviewed
20  yesterday?
21      A.  Well, primarily it contains discovery
22  documents that I received from my clients'
23  depositions, reports, photographs.
24          It contains a few items that I found on my
25  own, just some research items on the subject

Page 9

1  fiberglass pipe, and that's pretty much it.
2      Q.  Okay, you mentioned reports.
3          Do you have a copy of Sullivan Curran's
4  report?
5      A.  I do.  Should I pull it out?
6      Q.  No, sir.
7          Do you have a copy of Mr. Wenzel and Dr.
8  Manning's report?
9      A.  I do.
10      Q.  Any other reports that are in your file
11  that you're aware of?
12      A.  There's one from -- I believe they're
13  called MDA in Pennsylvania.  They were initially
14  involved.  And they did a -- I guess the initial
15  inspection -- on the subject fiberglass pipe.
16      Q.  And MDE ---
17      A.  --- MDE?
18      Q.  --- Is that familiar?
19      A.  Yeah, MDE.  I'm sorry.  Let me just
20  verify.
21      (Witness examined documents)
22      A.  MDE.  Correct.
23      Q.  And MDE was retained by the Navy.
24  Correct?
25      A.  I believe so.

Page 10

1    Q.   Okay, and MDE did destructive testing of
2  the damaged pipe.  Correct?
3    A.   They did.
4    Q.   Were you present for some of that
5  destructive testing?
6    A.   I was not.
7    Q.   Were you present at MDE's facilities after
8  they did some destructive testing?
9    A.   I was.  I -- I visited them after the --
10 their destructive testing and did a visual inspection
11 of the subject pipe.
12   Q.   And what did you learn during your visual
13 inspection of the damaged pipe?
14   A.   It wasn't so much learning but documenting
15 the -- the features of the pipe.
16         I took many photographs.  I made some
17 measurements of the thickness of the pipe, asked a
18 few questions.  But mainly it was just characterizing
19 and documenting the pipe.
20         But I -- I didn't walk away from that
21 inspection with -- with any conclusions at that
22 point.
23   Q.   Okay, so it sounds like you were just
24 obtaining some general information about the pipe.
25 Is that fair?

Page 11

1    A.   That's correct.
2    Q.   You also mentioned depositions.
3         Have you read the deposition of Bryan
4  Yosay?
5    A.   I have not.
6    Q.   Have you read the deposition of Gabe
7  Gallegos?
8    A.   I have not.
9    Q.   Okay, read the deposition of Mr. Curran?
10   A.   I have not.
11   Q.   Okay, read the deposition of Dr. Manning?
12   A.   I have.
13   Q.   Have you read Clyde Williamson's
14 deposition?
15   A.   I have not.
16   Q.   Paul McIntyre?
17   A.   No.
18   Q.   Okay, so it sounds like the only
19 transcripts that you've read have been Mr. Curran and
20 Mr. -- or Dr. Manning.  Is that correct?
21   A.   That's correct.
22   Q.   Okay, Mr. Pfaendtner, you also mentioned
23 photographs.
24         MR. REICH:  Can we go off the record
25 for a second?a

Page 12

1         MS. GAVALIER:  Yes.
2         (Brief recess)
3    Q.   Okay.  Mr. Pfaendtner, you also mentioned
4  photographs.
5    A.   Yes.
6    Q.   Have you taken photographs of the damaged
7  pipe yourself?
8    A.   Yes.
9    Q.   And have -- are those photographs all on
10 the drive that you gave us this morning?
11   A.   Yes, they are.
12   Q.   Mr. Pfaendtner, have you performed any
13 calculations?
14   A.   The calculations were -- any calculations
15 performed were done by my -- my colleagues at Crane
16 Engineering, namely -- primarily Chris Brand who's a
17 mechanical engineer -- at my request.
18   Q.   Okay, and are his calculations included in
19 your file materials you gave us this morning?
20   A.   His -- his calculations are in form of a
21 finite element analysis, so it's not a very portable
22 -- I -- I -- I suppose -- it -- I -- it could be
23 transported to you electronically.  But it's not
24 contained on that flash drive.  But it's certainly
25 producible.

Page 13

1    Q.   Okay.  And I'll ask you ---
2    A.   --- Okay.
3    Q.   --- Some more questions about that later.
4         Mr. Pfaendtner, you had mentioned that you
5  had been deposed about 10 times before.  Is that
6  correct?
7    A.   Yes.  This is, I believe, the tenth
8  deposition.
9    Q.   Okay, and have the depositions that you've
10 participated in all been in conjunction with
11 providing litigation services?
12   A.   Yes.
13   Q.   Okay.  I'm going to hand you what we'll
14 mark as Exhibit 2.
15         (* Exhibit 2 was marked *)
16   Q.   And that should look familiar to you.
17         Mr. Pfaendtner, is that a copy of your
18 curriculum vitae?
19   A.   It is, but it's -- doesn't appear to be
20 the most current version.
21   Q.   Do you have a current version that you can
22 provide to us?
23   A.   Yes.  I -- I have it on my computer.  And
24 it may -- I can check -- but it might be on that
25 thumb drive.  But I -- I think essentially the only

4 (Pages 10 to 13)

Page 14

1  changes are in -- in my title.
2      Q.  Okay.  Well, we'll work our way through
3  and you can ---
4      A.  --- Okay.
5      Q.  --- Provide me the updates as we go.
6      Mr. Pfaendtner, you are a licensed
7  professional engineer.  Correct?
8      A.  Yes.
9      Q.  Are you licensed in North Carolina?
10     A.  I am not.
11     Q.  Have you ever done any work in North
12  Carolina?
13     A.  I have not, no.
14     Q.  Which states are you licensed in?
15     A.  In Ohio and Minnesota.
16     Q.  Is your license in Ohio active?
17     A.  It is.
18     Q.  And is your license in Minnesota active?
19     A.  Yes.
20     Q.  Have you ever had any disciplinary action
21  taken against you by any of the states in which you
22  are licensed?
23     A.  No.
24     Q.  Have you ever had any complaints filed
25  against you in any of the states in which you are

Page 15

1  licensed?
2      A.  No.
3      Q.  Do you hold any other professional
4  licenses?
5      A.  No.  Other than my -- my degrees, no.
6      Q.  Okay, and you have a bachelor of science
7  in material science and engineering.  Correct?
8      A.  Yes.
9      Q.  Okay, and then a PhD in material science
10  and engineering.  Correct?
11     A.  Yes.
12     Q.  Mr. Pfaendtner, in order to maintain your
13  engineering licenses in Ohio and Minnesota, do you
14  have to take continuing education courses?
15     A.  I need -- for both space I need continuing
16  education credits.  But -- and they can take form of
17  courses or presentations, papers published, things
18  like that.
19     Q.  Okay, so if I understand you correctly,
20  you can either take a course or you can participate
21  in a presentation or published work also counts
22  toward credit.
23     A.  Right.  That's correct.  And I -- I
24  believe most of my recent credits have been from me
25  giving presentations.

Page 16

1      Q.  Okay.  Now, it looks like your CV does not
2  contain a list of presentations.
3      Do you have a list of those anywhere?
4      A.  I have it electronically.  I -- I -- I
5  have a spreadsheet that -- on which I track my -- my
6  credits for my licensure.
7      Q.  Okay, would you be willing to provide us a
8  copy of the presentations that you've done in the
9  past five or so years?
10     A.  Sure, sure.  Although I -- some of them
11  are proprietary, some of them are giving -- given
12  confidentially to our industrial clients.  So I -- I
13  think I can generically state that without giving
14  away the client's name.
15     Q.  Thinking back on the presentations that
16  you've done in the past five or so years, have any of
17  them dealt specifically with fiberglass pipes?
18     A.  No.
19     Q.  Okay.  Again, given the same timeframe,
20  have any of your presentations involved fuel
21  releases?
22     A.  Yes.
23     Q.  And can you explain that to me a little.
24     A.  The -- one of Crane Engineering's main
25  areas of expertise is fuel related instances of --

Page 17

1  especially propane gas, natural gas incidents,
2  whether it's explosion, a fire, a carbon monoxide
3  poisoning.
4      So we -- we've done many, many
5  investigations related to -- to those types of
6  incidents.
7      Q.  I believe you said fuel related incidents.
8  Correct?
9      A.  Yes.
10     Q.  And is there a -- are those fuel related
11  incidents all the result of similar causes or
12  different causes?
13     A.  It's -- it's -- it's a whole host of
14  causes.
15     Q.  Okay.
16     A.  It's never the same.  But in the end, they
17  -- it -- I -- I would say many times, though, they
18  come down to a material failure, though, of -- of
19  some kind, whether it's metallic or a composite
20  failure of -- of one kind or another.
21     Q.  Any that you recall that -- where the
22  cause was a broken or damaged pipe?
23     A.  Several involved damaged pipes and
24  fittings of both metallic and composite.
25     Q.  And am I correct in thinking that a

Page 18

1  fiberglass pipe would be considered a composite pipe?
2      A.  Yes.
3      Q.  Okay, Mr. Pfaendtner, are there any
4  continuing education credits that you've taken
5  recently where the course has involved fiberglass
6  pipes?
7      A.  No.
8      Q.  Any continuing education courses that
9  you've attended recently that involve fuel releases?
10     A.  Yes.  I've -- I've presented on -- on fuel
11 releases -- or at least the -- the material failure
12 portion of -- of fuel releases.
13     Q.  Okay, any courses that you've taken to
14 obtain credits that involved ---
15     A.  --- No, I -- I usually teach the courses.
16     Q.  Right.  Your CV contains a list of
17 publications, and it looks like the last publication
18 was in 2004.  Is that correct?
19     A.  Yes.
20     Q.  And have you had any publications since
21 2004?
22     A.  None in peer review journals such as --
23 such as these.  These -- these publications on my CV
24 are mainly done as part of my graduate school work,
25 which is -- publications is essentially a requirement

Page 19

1  of -- of doing graduate school work, so....
2      Q.  So anything that has been published since
3  2004, what kind of -- strike that.
4      Have you been published in like trade
5  magazines or news letters, things of that nature
6  since 2004?
7      A.  On -- on rare occasion I might have two or
8  three publications out there in trade journals,
9  things like that, but not -- not peer reviewed.
10     Q.  Okay.
11     A.  Although, I -- I'm currently working on a
12 paper to be published in the peer review journal.
13     Q.  What's the subject of your current paper?
14     A.  It has to do with failure of -- of brass
15 that results in -- in fuel releases or -- and -- and
16 water releases.  In particular, we see this a lot in
17 -- in water damaged homes.  So it -- it has to do
18 with improper composition of the brass and -- and
19 environmental interactions with that improper
20 composition that causes it to fail prematurely.
21     Q.  So you said that most of your publications
22 listed here were produced as a result of your
23 graduate work.  Correct?
24     A.  Yes, with the exception of the last one
25 that was published while I was at General Electric.

Page 20

1      Q.  Okay, and what was the subject matter of
2  that last one?
3      A.  Part of my work at General Electric
4  Aviation -- the -- the business was designing and
5  manufacturing jet engines, commercial and military
6  jet engines.
7      I worked in our research and development
8  group developing coatings for the high temperature
9  section of the engine -- the -- the -- the turbine.
10     And in particular, my work involved
11 developing coatings, high temperature coatings, for
12 the turbine.  And these are coatings that -- that
13 operate in excess of 2,000 degrees Fahrenheit, so --
14 so that paper has to deal with the durability of
15 these composite coatings.
16     Q.  When I was glancing through the list of
17 the other publications, I noticed two words seem to
18 come up frequently, and one was alloys.
19     I believe we've already ---
20     A.  --- Yes.
21     Q.  --- Mentioned alloys this morning.  If you
22 can just give me a general idea of what an alloy is.
23     A.  An alloy is -- generally it refers to
24 metallic materials.  And an alloy is essentially a
25 mixture of two or more metal elements together, so --

Page 21

1  for instance, brass is a combination of copper and
2  zinc.  Steel is usually a combination of primarily
3  iron with -- with carbon and manganese and other --
4  other additions depending on -- on what the function
5  of the steel is in -- in application.
6      Q.  The other term that I saw come up
7  frequently was embrittlement.
8      Can you explain embrittlement to me?
9      A.  Sure.  Embrittlement is -- it -- it's an
10 effect of chemical composition usually involving
11 impurities.
12     So say we were -- we were talking about
13 brass.  Brass is susceptible to, I guess, a type of
14 embrittlement by ammonia.  And -- and so that's
15 actually the subject of the paper I'm working on.
16 Ammonia can cause brass to crack.
17     Stainless steels can be cracked by
18 chlorine in the environment.  Steels can be cracked
19 by things like phosphorus and sulfur.
20     So embrittlement generally refers to the
21 failure of -- of alloys under influence of these
22 impurities.  And the impurities can come from the --
23 the environment such as ammonia or -- or -- or
24 chlorides from -- from -- from the sea, or they can
25 be internal impurities such as sulfur and phosphorus

Case 7:13-cv-00021-BO   Document 71-3   Filed 06/12/14   Page 7 of 20

Page 22

1   and arsenic, things like that, that get into the
2   steels. And then are -- so they're -- they're
3   present from the very beginning from the manufacturer
4   of the alloy. And then they -- they rear their heads
5   sort of later on when the part is in use.
6       Q.  Would you say that what you've just
7   described to me has been a focus of your research --
8   or was the focus of your research when you were a
9   graduate student?
10      A.  The -- the embrittlement, in -- in
11  particular, a -- a type of embrittlement called
12  dynamic embrittlement was the focus of my PhD work.
13  But -- but it -- it falls under the general heading
14  of -- of -- of failure analysis of materials.
15      Q.  Does embrittlement only occur with an
16  alloy?
17      A.  No. It -- the -- the phenomenon of
18  environmental interaction occurs across, essentially,
19  all materials. But it's -- it's -- it's -- it -- it
20  takes on a different name depending on the material.
21          So plastics are susceptible to
22  environmental interactions. And it's -- one of them
23  is called environmental stress cracking, which is --
24  is a form of embrittlement.
25          So we see that in -- in sprinkler systems

Page 23

1   where you have plastic pipe and plastic fittings. So
2   -- so we can talk about embrittlement in -- in just
3   about every material class. But it takes on a
4   different name usually.
5       Q.  Since the subject pipe here is a
6   fiberglass pipe, is there a type of embrittlement
7   that can affect a fiberglass pipe?
8       A.  In a sense, yes. Every -- pretty much
9   every material has -- has its vulnerabilities, and so
10  if you go to, say, the Amron website and you look at
11  -- or any fiberglass pipe manufacturer's website, it
12  will -- generally will give you a list or a -- a
13  matrix of, use this pipe for this environment. So
14  you know, it might be used for fuel gas or used for
15  conveying compressed gas or natural gas.
16          So generally pipes are constructed to take
17  into account the environments that they're going to
18  encounter both the -- the material it's going to
19  convey.
20          So JP-5 jet fuel or -- and as well as the
21  -- the environment surrounding it -- soil -- whether
22  it's, you know, acetic soil or -- or -- or whatever.
23  So -- so generally you -- you want to select
24  materials based on -- on the -- the operating
25  environment.

Page 24

1       Q.  Did you do any research on fiberglass
2   pipes when you were a graduate student?
3       A.  No. My -- my primary -- although, I -- I
4   had graduate -- or engineering classes as -- when I
5   was an undergrad and graduate student involving
6   composites. And so we -- we studied it from an
7   engineering standpoint.
8           And then my practical experience with
9   composites happened at General Electric. So I -- I
10  was a member of -- during my nine years at GE I was a
11  -- a few of those years I was in the composites
12  technology group. So we didn't -- we didn't produce
13  pipe, but we produced composite fan blades such as on
14  a commercial jet engine.
15          When you look inside the -- the opening of
16  the -- of the jet engine, you'll see a -- a fan.
17  Well, some of those fan blades are made of
18  composites, mostly made of carbon fiber not glass
19  fiber like the -- the subject pipe.
20          So -- but -- but it -- the -- the -- the
21  technologies are very similar. You have fibers,
22  whether it's a glass fiber such as the pipe, or a
23  carbon fiber in a -- in a -- in a polymeric resin, so
24  -- so a plastic -- so a fiber mixed with a plastic
25  that make up these -- these structures.

Page 25

1       Q.  Okay, let's actually take a look at your
2   employment history.
3           You are presently with Crane Engineering.
4   Correct?
5       A.  Yes.
6       Q.  And what is your title or position at
7   Crane Engineering?
8       A.  Well, it -- it's -- it's been evolving.
9   Until very recently I was chief technical officer and
10  principal engineer.
11          But we've, just in the last couple of
12  weeks, are -- have gone through a reorganization, so
13  my title now is just simply principal engineer.
14      Q.  And you started at Crane Engineering in
15  2007. Correct?
16      A.  Yes.
17      Q.  Did you start as the chief technical
18  officer at that time?
19      A.  I'm not sure or I don't recall what my
20  title was. But it was, I think, just consulting
21  engineer.
22      Q.  Okay, as a consulting engineer, what did
23  your duties include?
24      A.  When I initially started, those duties
25  just simply included being an individual contributor,

Page 26

1   primarily working on our industrial consultation side
2   of the business, which is basically non-litigation
3   related work.
4          So for instance, we -- we do a lot of
5   consulting for medical device manufacturers in the
6   twin cities area. So a lot of small companies, some
7   of them startups, will come to us for specific
8   engineering expertise that they don't have in-house.
9   So we'll -- we'll offer that to consultation and
10  materials evaluation, testing, things like that.
11         And then the smaller fraction was
12  litigation related, sub -- subrogation primarily.
13      Q.  In the industrial consultation services
14  that you provide, is it a wide range of engineering
15  services or do you tend to focus on a specific field
16  of engineering?
17      A.  No.  No, it -- it's very broad.  And --
18  and my -- my background is -- is very broad in
19  materials.
20         I worked on metallic alloys from medical
21  devices to large industrial structures.  We worked on
22  architectural glass.
23         We've consulted with manufacturers of --
24  of -- of cookware that use -- that you might use in
25  your kitchen, on the mechanical properties of

Page 27

1   cookware, things like that.
2          So really anything materials, we've --
3   we've investigated -- to, you know, the -- the facade
4   on -- on -- on a high-rise building that is -- has
5   some kind of staining or something.  We'll -- we'll
6   get in and look at the -- what caused it, whether
7   it's -- it's, you know, air pollution or -- or -- or
8   whatever.  So really, any -- anything materials
9   related we will do, including plastics.
10      Q.  Would you say that the same scope of your
11  services applies to the litigation services that
12  you'll provide?
13      A.  Yes.
14      Q.  You had said that, to the best of your
15  recollection, you had started at Crane Engineering as
16  a consulting engineer.  Correct?
17      A.  I don't know if that was my exact title
18  but it was as an individual contributor working with
19  clients.
20      Q.  Okay.  Did it evolve at some point in
21  time?
22      A.  Yes.  And it was -- it was almost a
23  continuous evolving.
24         Crane Engineering's a small company, so
25  there are few boundaries, so you kind of progress,

Page 28

1   you know, by your -- sort of your -- your interests
2   and then your talent.
3          One of the first larger responsibilities I
4   took on was, essentially, ownership of the industrial
5   consulting part.  So I -- I oversaw the team that
6   did, primarily, the -- the  industrial consulting.
7   So I was a -- the -- I guess, the team leader.
8      Q.  Okay, and after you were the team leader
9   of the consulting -- excuse me -- the industrial
10  consulting portion of Crane Engineering, was there
11  another step or progression after that?
12      A.  Yes.  The next step was to vice president,
13  so I was one of three vice presidents.  And with this
14  recent reorganization, the vice president title is --
15  is gone away and replaced by something else.
16         And then after vice president I -- I
17  essentially accumulated titles.  So I was vice
18  president and then chief technical officer and then I
19  also got the title of principal engineer.  So I -- I
20  -- I guess for a while I was carrying those three
21  titles.
22      Q.  Okay, and as chief technical officer, vice
23  president, and principal engineer, what were your
24  duties?
25      A.  Still, you know, the primary duty was to

Page 29

1   serve clients.  So I was still essentially a -- a
2   team leader or a project leader team leader.
3          But the scope of my projects became larger
4   and larger and -- and mainly involving multiple
5   disciplines.  So I would be project manager for a --
6   a project that required multiple engineering
7   disciplines.
8          It also involved the -- mentoring my
9   colleagues on report writing, the scientific method,
10  and -- and generally just the execution of -- of
11  industrial cases and legal cases from -- from a
12  technical standpoint.
13      Q.  In your current position, or positions,
14  about how much of your time is divided between the
15  industrial consultation services and the litigation
16  services?
17      A.  It's on the order of -- of 80 percent
18  legal and 20 percent industrial consultation.  And so
19  the -- the industrial consultation I do now is -- is
20  primarily larger projects and -- and -- and not so
21  much the -- the the small projects that -- that
22  take a day to execute.
23      Q.  Prior to working at Crane Engineering you
24  were at GE Aviation.  Correct?
25      A.  Yes.

8  (Pages 26 to 29)

1      Q.  Okay, and it looks like you started there
2  in 1998.  Does that sound right?
3      A.  Yes.
4      Q.  And it looks like you started as a lead
5  engineer.  Is that right?
6      A.  Yes.
7      Q.  Okay, and what were you responsible for as
8  a lead engineer?
9      A.  Again, I was -- I was essentially an
10 individual contributor working several engine
11 programs that were sub-sections of larger programs.
12         So if-- if you imagine a jet engine that
13 has many components, and so it -- it's -- it's
14 divided up.
15         You can imagine the tree of -- of -- of
16 projects and -- and -- and management layers.  And it
17 takes 10 to 20 years to develop an engine.  So -- so
18 it -- it -- it -- it gets all divided down across a
19 thousand people or more.
20         So my -- my duties were mainly developing
21 new coatings for -- for the turbine section.  So I
22 had a -- a small team of -- of engineers with whom I
23 worked.  But I -- I wasn't in charge of anyone.
24     Q.  And developing those new coatings that you
25 talked about earlier, was that the main focus of your

1  work from 1998 to 2002 as a lead engineer?
2      A.  Yes.  Yes.
3      Q.  Okay.  And then it looks like in 2002 you
4  became a staff engineer.  Correct?
5      A.  Yes.
6      Q.  And did your duties change as a staff
7  engineer?
8      A.  No.  And -- and that's a distinction I
9  never really understood.  I think it was more of a --
10 an administrative distinction.  It was essentially
11 the same duties.
12     Q.  So it's fair to say that you had the same
13 responsibilities as a staff engineer that you had as
14 a lead engineer.
15     A.  Right.  And -- and I think it might just
16 be a reflection of more -- more experience, more
17 seniority in -- in the -- in the department.  But it
18 -- I -- I still was an individual contributor.  But
19 also, I -- I -- I switched departments at that point
20 as well, so....
21     Q.  Did the focus of your work change?
22     A.  Yes, yes.
23     Q.  And what was your focus when you changed
24 departments?
25     A.  Well, as I mentioned earlier, I moved to

1  the composites technology department, which was
2  essentially a -- a -- actually it's a -- a section
3  within the materials department.  So I -- I moved to
4  a different section.
5         I -- I moved from a group focused on high
6  temperature materials, high temperature alloys, for
7  the -- the turbine to a -- a group that had a -- a
8  focus on lower temperature materials such as the fan
9  blades and -- and things like that.
10        I also -- but my -- my primary focus
11 during that time was classified, so I had a -- a
12 government security clearance.  So it was classified
13 work that I was doing.
14     Q.  And then prior to your work with GE
15 Aviation you were a research fellow at the University
16 of Pennsylvania.  Correct?
17     A.  That's correct.
18     Q.  Okay.
19     A.  And research fellow is essentially my PhD
20 work.
21     Q.  And we talked about that a little bit with
22 regard to your publications.
23        Is there any other work that you did as a
24 research fellow that we didn't touch on earlier this
25 morning?

1      A.  I -- I did a small amount of consultation
2  with my advisor, you know, litigation related things.
3  But -- but not that much.
4      Q.  So ---
5      A.  --- But with my main research, there were
6  many peripheral activities such as designing and
7  constructing of -- of testing equipment, doing --
8  characterization of materials, so using microscopes
9  and -- and essentially probing the -- the chemical
10 composition of materials, probing the mechanical
11 properties of materials, strength and durability,
12 things like that.  So it was kind of a -- a broad
13 endeavor, but focused on solving one specific
14 problem.
15     Q.  Did any of those peripheral activities
16 that you just referenced -- and I know that's a
17 somewhat vague term -- but did any of those
18 peripheral activities involve fiberglass materials?
19     A.  No.  My -- my graduate studies essentially
20 involved advanced materials.  Composite fiberglass is
21 -- is a -- it's a well established material.  And
22 then so my -- my work was on more cutting-edge
23 things.
24     Q.  To your knowledge, has there been any
25 advances in fiberglass materials in recent history?

Page 34

1      A. Well, certainly there have been advances
2 in composites, namely, the replacement of fiberglass,
3 which is a silicon oxide material. It -- it's an
4 oxide.
5      The replacement of those fibers with --
6 with other fibers such as various forms of carbon,
7 graphite, things like -- you've heard of Kevlar,
8 which are -- these are all fibers that can be
9 introduced or -- or held together with a resin, you
10 know, an epoxy-like material to form shapes.
11      So -- so the advancement isn't so much in
12 the advancement of, say, the chemistry of the glass
13 fiber. It's just get rid of glass fiber and use
14 other more capable materials.
15      Q. Was fiberglass a common material to be
16 used in the early 1980's?
17      A. The -- I don't -- I'm -- I don't know
18 about the evolution of that industry. But certainly,
19 you know, we've all been in a fiberglass boat or a
20 canoe or something like that.
21      So I'm not sure when fiberglass was -- was
22 introduced, but certainly it's been around for -- for
23 many decades. And it's still used today. You know,
24 if you have a -- a -- a composite shower stall, a lot
25 of those are -- are a fiberglass composite that are

Page 35

1 -- it's fiberglass that's sprayed on.
2      Q. Uh-huh. But it sounds like from what you
3 said earlier, perhaps there are materials that are
4 replacing fiberglass now. Is that fair?
5      A. Well, as -- as a need arises. You know, I
6 mentioned the -- the -- a fan blade on a jet engine.
7 You know, fiberglass isn't capable of -- of operating
8 in a jet engine.
9      So you need more -- more capable
10 materials, whether that means stronger, tougher, more
11 resistant to heat, things like that. So -- so
12 fiberglass is -- is a -- it -- it -- it's -- it's
13 essentially a commodity material. But still has --
14 obviously has its uses in -- in -- in industry.
15      Q. Mr. Pfaendtner, have you been involved in
16 any projects that related to locating, excavating, or
17 replacing a pipeline?
18      A. Well, every project is unique. But
19 certainly I've been involved in -- in pipelines of --
20 of various sorts.
21      Fiberglass -- I was involved in a fuel
22 release at a gas station in Texas whereby a
23 fiberglass line broke and there was environmental
24 damage.
25      But -- but primarily it's -- it's -- it's

Page 36

1 failure of pipelines and pressure vessels that either
2 hold a gas that -- that rupture and cause property
3 damage or -- or injury or death.
4      Q. The gas station in Texas, in what capacity
5 were you involved in that incident?
6      A. It -- it was similar to this -- in -- in
7 this matter here.
8      I -- I received the -- the fiberglass pipe
9 artifacts, did -- did inspections, destructive
10 inspections, microscopic work, chemical analysis,
11 things like that to -- to -- to essentially
12 understand the failure and how the failure came
13 about.
14      Q. And what was the cause of the failure of
15 the fiberglass pipe at the gas station in Texas?
16      A. It -- it was essentially installation
17 related. It was a -- the -- the installer had -- had
18 applied too much torque -- or not too much torque
19 but he was applying a fitting to the fiberglass pipe.
20      He did not take care to use a -- a backing
21 wrench so that he didn't transmit his -- the torque
22 of applying this fitting into the system. So he --
23 he -- he tightened down this -- this fitting, and the
24 -- the -- the force of that was transmitted into the
25 system. And it reached a weak point and it caused

Page 37

1 failure. It caused a -- an underground failure that
2 -- that wasn't visible.
3      Q. Was that weak point in a length of the
4 pipe or was it a -- at a joint?
5      A. It was at a joint.
6      Q. Do you recall, generally, when it was that
7 you were involved at that -- that project?
8      A. About three years ago.
9      Q. Okay. Any other projects that come to
10 mind that are similar to what we're dealing with in
11 this case today?
12      A. Well -- well, they're all similar. Maybe
13 not the technology of a fiberglass pipe, but
14 generally most material fail -- failures involve an
15 understanding of the stresses that -- that caused the
16 failure.
17      Is there any corrosion mechanism. And --
18 and I use the term corrosion loosely in that are
19 there environmental interactions that -- that -- that
20 weaken the material over time, things like that.
21      So I -- I tend to view failures from a
22 fundamental standpoint using fundamental engineering
23 principles of -- of engineering mechanics, and -- and
24 chemistry and metallurgy materials. So what -- what
25 are the fundamentals. And -- and -- and so I -- I

Case 7:13-cv-00021-BO   Document 71-3   Filed 06/12/14   Page 11 of 20

Page 38

1    use this engineering toolbox and apply it to -- to
2    the -- the problems in general.
3         Q.  So it sounds like a lot of what you deal
4    with are -- or the projects that you investigate have
5    to deal with material failures.
6         A.  Yes.  Or at least that's when I become
7    involved.  But -- but Crane Engineering obviously has
8    a -- a larger scope.
9         Q.  And in trying to drill down a little bit,
10   are there other material failures where you have
11   dealt with pipes specifically?
12        A.  I would say the -- the majority of my
13   cases involve pipes and pipe fittings.
14        Q.  Okay, any specifically that have to deal
15   with fiberglass pipes?
16        A.  Primarily, they're -- they're metallic,
17   they're steel pipes, copper pipes, brass pipes.  I --
18   I can't give you the number involving composites or
19   fiberglass but it's -- it's a handful.
20        Q.  Okay.  This may help us a little bit.  If
21   you'll turn in your CV to -- I believe it's the third
22   page.  You've got a list of your testimony in the
23   past four years.
24             Does that list look up-to-date to you or
25   are there other cases that you've provided testimony

Page 39

1    in?
2             (Witness examined document)
3        A.  I think there are two that are missing
4    this year.
5        Q.  So two additional cases from 2014?
6        A.  I -- I believe so.  I -- I had a -- my --
7    I -- I have it electronically.  I -- I believe so.
8        Q.  And if we could just get an updated copy
9    of your ---
10       A.  --- Sure.
11       Q.  --- Testimony that would be great.  Since
12   it looks like we have a manageable list in front of
13   us ---
14       A.  --- Uh-huh.
15       Q.  --- I would like to just touch on each one
16   very quickly and have you give me a general overview
17   of the issue that was involved.
18       A.  Okay.
19       Q.  Okay, so let's just go ahead and start
20   with the first one that's -- it looks like your
21   deposition date was January 8th of 2014.
22            What was at issue in that case?
23       A.  That was a hog barn fire in Iowa involving
24   a -- a lightening -- I'm sorry -- not a lightening
25   strike but snow load -- heavy snow load collapsed the

Page 40

1    roof.  But there were few witnesses so -- that work
2    involved, mainly a forensic analysis of the evidence
3    to understand the sequence of events.
4             And -- and so in that case, my involvement
5    was -- primarily dealt with a -- a -- a gas pipe that
6    conveyed propane gas and -- and the effects of heat
7    on that pipe.  And -- and so I was able to use my
8    analysis to -- to -- to add detail to the time line,
9    the sequence of events, which became important to the
10   case.
11       Q.  Was the analysis done in part to determine
12   the cause of the fire?
13       A.  Yes.
14       Q.  Okay, and what did you determine the cause
15   of the fire was?
16       A.  Well, I determined the cause of the fire
17   was -- was consistent with -- with a -- I'm -- I'm
18   not a structural engineer.  There were structural
19   engineers who made the determination that, yes, there
20   was a -- a snow load collapse here.
21            And so my -- my work -- what I found was
22   essentially the characteristics of the gas pipe was
23   consistent with -- with a -- a -- a collapse in the
24   roof causing a break, causing the fire because you
25   had gas coming out of the pipe.  And that -- that

Page 41

1    flame impinged the pipe itself, caused metallurgical
2    changes to the pipe.
3             So my study was of the metallurgical
4    changes to the pipe and -- and -- and -- and the
5    duration of those metallurgical changes to the pipe.
6        Q.  Okay.  So moving on to the second one, it
7    looks like your deposition date was December 6th,
8    2013.
9             What was at issue in that case?
10       A.  That was a case in Florida involving a
11   pool heater.
12            In particular, there was a gas regulator
13   that had internal corrosion and the gas regulator
14   stopped working.  The homeowner went to light the
15   pool heater and was burned because of escaping gas.
16       Q.  Okay, moving down to the third row, it
17   looks like the trial date was set for July 29th,
18   2013.
19            Did that case go to trial?
20       A.  It did.
21       Q.  Did you testify at trial?
22       A.  I did.
23       Q.  Had you been deposed prior to the trial?
24            (Witness examined document)
25       A.  No, I -- I don't believe so.

Case 7:13-cv-00021-BO   Document 71-3   Filed 06/12/14   Page 12 of 20

Page 42

1    Q.  Can you briefly tell me what was at issue
2  in that case.
3    A.  At issue there was a -- a gas fuel line in
4  a residence.  There was a brass fitting that
5  underwent one of these embrittlement phenomena and
6  cracked, allowing gas to -- to be released in a crawl
7  space underneath the residence.
8        And there was a -- a -- I forget if there
9  was an explosion or just a fire, but the house was
10  destroyed.
11    Q.  Moving down to the fourth row, it looks
12  like your deposition was on May 20th, 2013.
13        What was at issue in that case?
14    A.  That was a case in the -- in the Bakken
15  Oil Field in North Dakota involving a -- a drilling
16  -- oil drilling derrick for drilling oil wells.
17        There was a -- a component that fell from
18  the derrick striking the worker and killing him.  It
19  -- it involved the failure of a -- of a chain that
20  was holding up this component.
21    Q.  Okay, and did you determine the cause of
22  the chain failure.
23    A.  It was overload.
24    Q.  Okay.
25    A.  So it -- it -- yeah, it was -- it was

Page 43

1  overload of the chain.
2    Q.  And when you say overload, was that -- do
3  you mean that it had worn out or that it was human
4  error in that someone had put too much weight on the
5  chain?
6    A.  I -- I think those things are -- were
7  indeterminate.  Obviously I wasn't there during the
8  incident.  But it was in the process of moving this
9  several ton oil derrick on to a flat bed truck for --
10  for transport.
11        So again, you don't know if it was dropped
12  slightly or -- or what happened, but -- but the --
13  the chain simply broke by overload, so it -- it
14  experienced stresses in excess of it's strength, so
15  it just failed -- pulled apart.
16    Q.  Okay.  All right, moving down to the
17  second-to-last line, it looks like you were deposed
18  on April 18th, 2013, and if you can tell me briefly
19  what that case involved.
20    A.  That was another fire, propane fire, of a
21  -- it was in a trailer park.  The trailer owner died
22  as a result of it.
23        My -- my involvement in that case was --
24  was fairly focused.  It had to do whether or not a --
25  a gas valve was open or closed at the time of the

Page 44

1  fire.
2        So it was essentially a -- a forensic
3  analysis, a materials analysis of this brass ball
4  valve to understand what -- what setting it was on.
5  Was it in the open position or closed position at the
6  time of the fire.
7    Q.  Okay.  Looking at the last entry on the
8  page, it looks like the trial was the week of
9  September 27th, 2012.
10        Do you recall if that case went to trial?
11    A.  It did.
12    Q.  Okay, did you testify at trial?
13    A.  Yes.
14    Q.  And what did that case involve?
15    A.  That involved a compressed oxygen gas
16  cylinder.  The -- the kind that are used in -- in
17  welding and -- in all sorts of industries.  You may
18  have seen them.  They're just steel cylinders that
19  have -- whether nitrogen or compressed air or oxygen.
20        This case involved a oxygen cylinder that
21  -- that burst while it was being filled.  The -- the
22  cause of the rupture was in -- internal corrosion of
23  the cylinder.  So it -- it killed the operator when
24  it -- it burst.
25    Q.  And it looks like on the next page, the

Page 45

1  second entry actually involves the same case.  Is
2  that correct?
3    A.  Yes, that was my deposition.
4    Q.  Okay.  All right, the first entry on the
5  second page, it looks like you testified at an
6  arbitration on September 18th, 2012.
7    A.  Yes.
8    Q.  What was at issue in that case?
9    A.  That involved electric motors that are
10  used in, like, slushy machines.  If you go to 7-11
11  there's a -- a slushy machine.
12        Well, these are motors that turn the auger
13  inside those slushy machines.  The -- the designer of
14  that motor was a U.S. based company, but the -- the
15  motors themselves, or at least the components, were
16  sourced overseas.
17        And in particular, this -- this case
18  involved substitution, so the -- the -- the
19  manufacturer of one of the sub components changed --
20  substituted a bearing and -- and essentially
21  substituted grease that -- that -- that lubricated
22  the bearing without notifying their client.  So these
23  -- these motors failed prematurely.
24    Q.  Okay.  All right, moving down to the March
25  27th, 2012 deposition date, what was at issue in that

Case 7:13-cv-00021-BO   Document 71-3   Filed 06/12/14   Page 13 of 20

Page 46

1    case?
2         A.  I'm sorry, is that the second-to-last?
3         Q.  Yes, sir.
4         A.  That case involved the failure of -- of
5    straps, rigging straps, used to move a piece of
6    machinery.
7              In this case it was a -- I believe it was
8    a laser cutting machine.  It was about a -- one
9    million dollar piece of equipment that was being
10   off-loaded from a flat bed truck for placement into a
11   -- into a manufacturing building.  A strap broke
12   causing the machinery to fall and -- and become
13   damaged.
14        Q.  What were the rigging straps made of?
15        A.  It was a -- it was a polymer material --
16   nylon.
17        Q.  And were you asked to determine the cause
18   of the failure of the rigging straps?
19        A.  Yes.
20        Q.  And what was your determination?
21        A.  That the straps were cut by -- because
22   they were improperly placed over a -- a sharp edge.
23        Q.  Okay, and looking at the last entry where
24   your deposition date took place on September 3rd,
25   2010, what was at issue in that case?

Page 47

1         A.  That was a water loss in Wisconsin
2    involving a -- a freeze-up of a -- a plumbing system
3    in a house.  And when the ice thawed, the -- the
4    water flowed and caused water damage.
5         Q.  Okay.  Now, you had mentioned that there
6    were two others that you don't believe are included
7    on this list.
8              Do you recall what those two cases
9    involved?
10        A.  Yes.  The -- one of them was actually a
11   second deposition in the Cass case, of the second
12   from the top on the first page -- the Robert D. Cass
13   and Carol Cass versus Fisher Controls.  It was a
14   second deposition in that case.
15        Q.  Do you know why you were deposed a second
16   time?
17        A.  I -- I don't know.  I -- the -- the
18   attorney liked depositions I guess.  In the second
19   one -- or a second one -- I'm not sure if it's the
20   last one that's -- that's missing here -- was a case
21   that's still active.
22              It involves an injury at the Minneapolis
23   Airport in which one of these ground power unit
24   cables -- so it's essentially when the -- the
25   airplane pulls up to the gate ---

Page 48

1         Q.  --- Yeah.
2         A.  --- The plane is plugged in ---
3         Q.  --- Uh-huh.
4         A.  --- So it gets power from -- from the --
5    from the ground as opposed to from the engines.  And
6    there was a -- a retainer clip that -- that holds
7    this heavy cable up on the gate, it broke and fell
8    and it hit one of the workers in the head, causing
9    injury.
10        Q.  Okay.
11        A.  I -- I don't recall any others at this
12   point.
13        Q.  Based on what we have just gone through,
14   you have not provided expert testimony in any cases
15   dealing with a fiberglass material.  Correct?
16        A.  No.  But I do have some active cases,
17   though, that involve fiberglass materials but they
18   haven't come to deposition or -- or trial yet.
19        Q.  Okay, how many active cases involve
20   fiberglass materials?
21        A.  Either two or three.  There's obviously
22   this one.  There's one involving a -- there are gas
23   fueled vehicles out there.
24              So compressed natural gas vehicles that
25   have -- or even propane -- there -- there are trucks

Page 49

1    on the road, cars on the road -- and the -- instead
2    of having a gas tank, they have pressurized gas
3    cylinders mounted to the -- the vehicle.
4              And many times those -- those tanks are --
5    are composite materials, whether it's fiberglass or
6    -- or carbon material.  But it's -- it's a -- I -- a
7    fiber-type composite material.  And so I have another
8    case right now involving a death in which one of
9    these cylinders burst.
10        Q.  And the gas tank is made of a composite
11   material?
12        A.  Yes.  So you know, imagine the -- the
13   propane tank you have on your grill ---
14        Q.  --- Uh-huh.
15        A.  --- But they also make those out of fiber
16   composites.  So it -- it's -- it's wound fiber with
17   a, you know, a -- a resin that holds the fibers
18   together.
19        Q.  So the gas tank is fiberglass?
20        A.  Well, it -- it -- it's a fiber composite.
21   So -- so again, fiberglass is -- is one -- one type
22   of -- of material belonging to a larger group of
23   materials of -- of fiber-wound parts that are -- that
24   have a resin matrix.
25        Q.  And have you determined what has caused

13 (Pages 46 to 49)

Page 50

1    the gas tank to fail?
2        A.  No.  No, that's -- it's so early on.
3        Q.  Any others -- strike that.
4            Any other projects that you're currently
5    working on that involve fiberglass other than the one
6    you just told me about?
7        A.  Well, it -- I have between a hundred and
8    150 active cases I think.  So I -- I -- I can't think
9    of any off-hand right now.
10       Q.  Okay.  In the one you just told me about
11   involving the gas tank, you have yet to provide any
12   testimony.  Correct?
13       A.  Right.  Right.  Actually, I -- I do recall
14   a similar case a few years back involving another
15   ruptured cylinder on a -- a CMG fueled vehicle.  I
16   don't know if that resulted in death.  But it was
17   another fiberglass tank containing compressed natural
18   gas.
19       Q.  And did you determine what -- did the gas
20   tank fail?
21       A.  It did.
22       Q.  Did you determine the cause of the failure
23   of the gas tank?
24       A.  I'm trying to remember the details of
25   that.  I -- I believe that one was a result of -- of

Page 51

1    rubbing.  So the -- the tank was rubbing against part
2    of the vehicle and it -- I think it -- it rubbed
3    through the wall of the -- of the tank, weakening it.
4        Q.  Did you provide testimony in that case?
5        A.  No, no.
6            Do you mind if I get another glass of
7    water?
8        Q.  Not at all.
9            Based on what we have just talked about,
10   you have not provided testimony with regard to a
11   fiberglass pipe.  Correct?
12       A.  No, I have not.
13       Q.  Okay.  Generally, with the cases that
14   we've looked at that are listed in your CV, do you
15   recall whether you were testifying on behalf of the
16   plaintiff or the defendants?
17       A.  Generally, I -- I have a mixture.  I don't
18   know if it's a 50/50 mixture, but it's -- it's --
19   it's -- I think it approximates an even mixture
20   between plaintiff and defendant.
21       Q.  Okay, so you've been hired by both ---
22       A.  --- Oh ---
23       Q.  --- Plaintiffs and defendants.
24       A.  Certainly.
25       Q.  In the cases in which you testified at

Page 52

1    trial, did the court qualify you as an expert
2    witness?
3        A.  Yes.
4        Q.  Okay, have you ever not been qualified as
5    an expert witness?
6        A.  No.
7        Q.  Mr. Pfaendtner, is there any education,
8    training, or experience that we haven't discussed
9    this morning that you feel like you relied on in
10   formulating your opinions in this case?
11       A.  Yes.  So as part of my education in -- in
12   engineering school, I've taken many mechanical
13   engineering classes because you can't study materials
14   in -- in a -- in a vacuum without understanding
15   mechanics of the materials.
16           So I've had several classes in engineering
17   mechanics, strength of materials, fracture mechanics
18   -- but just understanding the effects of -- of
19   stresses in -- in materials and -- and the -- the
20   result and behavior of those materials to -- to the
21   stresses.
22           So -- and -- and basically every -- not
23   every -- but -- but many failure analysis involve,
24   again, the combination of the -- the discipline of --
25   of engineering mechanics with -- with material

Page 53

1    properties and -- and understanding just the -- the
2    intersection of -- of -- of those where failure
3    happens.
4            So -- so clearly in -- in the -- in the
5    present case, we have a -- a damaged fiberglass pipe.
6    And understanding the -- the nature of that damage --
7    or what's critical to understanding the nature of
8    that damage is -- is, in essence, the -- the micro
9    mechanics going on in -- in -- in the fiberglass
10   material, understanding what forces are at play to
11   have caused this pattern of deformation.
12       Q.  And you mentioned that you took mechanical
13   engineering classes during your undergraduate work.
14   Correct?
15       A.  Yes.
16       Q.  Have you taken any mechanical engineering
17   courses since that time, whether it be continuing
18   education or some other professional course?
19       A.  No.  It was -- part of my PhD was -- was
20   mechanical engineering.
21       Q.  Okay.
22       A.  So several graduate level classes in
23   fracture mechanics, elasticity, continument --
24   continuum mechanics, finite element method, statics
25   dynamics, things like that.  But -- but fundamental

Page 54

1   core mechanical engineering course work.
2          MS. GAVALIER: I tell you what.
3   Let's take a quick break, just five minutes or so.
4          THE WITNESS: Sure.
5          MS. GAVALIER: We'll go off the
6   record.
7      (11:25-11:33 - recess)
8      Q. (Ms. Gavalier) All right, Mr. Phaendtner,
9   who retained you to work on this project?
10     A. Mr. Reich's firm.
11     Q. Womble Carlyle?
12     A. Yes.
13     Q. Have you worked with anyone at Womble
14  Carlyle prior to working on this project?
15     A. I have not.
16     Q. Do you recall when Womble Carlyle retained
17  you?
18     A. In September of 2011.
19     Q. September of 2011 was just a month after
20  the fuel release. Correct?
21     A. Yes.
22     Q. Have you had the opportunity to visit the
23  site of the fuel release?
24     A. I have not.
25     Q. Have you spoken with anyone from Amec?

Page 55

1      A. I have not.
2      Q. All right, Mr. Phaendtner, I'm going to
3   see if we can agree on certain things so that we can
4   lay a foundation for moving forward and exploring
5   your opinions.
6      A. Okay.
7      Q. Okay, do you agree with me that there was
8   a fuel release at the Marine Corps. Air Station, New
9   River on August 9th, 2011?
10     A. Yes.
11     Q. Do you agree with me that the fuel
12  transfer began around 12:30 p.m.?
13     A. That's what I understand happened.
14     Q. Do you agree with me that there was a
15  12,000 gallon fuel transfer?
16     A. That's what I read, yes.
17     Q. Do you agree with me that at one p.m.
18  3,000 -- excuse me -- 3,000 gallons were reported to
19  have been received?
20     A. I read that, yes.
21     Q. And do you agree with me that roughly
22  9,000 gallons of fuel was released?
23     A. Yes, that's what I read.
24     Q. So you would agree with me that in a
25  30-minute period of time, 9,000 gallons of fuel was

Page 56

1   release.
2      A. I think that's what the math works out to,
3   yes.
4      Q. And you would agree with me that the math
5   would work out to 300 gallons of fuel being released
6   per minute.
7      A. Yes.
8      Q. And that -- you would agree with me that
9   the math works out that that would be five gallons of
10  fuel released every second.
11     A. Yes.
12     Q. And you would agree with me that 9,000
13  gallons of fuel being released over a 30-minute
14  period of time is a catastrophic release.
15     A. I have no opinion on that. And I'm not
16  sure what -- I -- I suppose catastrophic can be
17  defined in many ways depending on -- on the nature of
18  -- of what happened. So I -- I have no opinion on
19  that.
20     Q. You would agree with me, though, that
21  9,000 gallons of fuel being released in 30 minutes is
22  not a minor release.
23     A. Again, I think that's more of a -- a -- an
24  OSHA type thing and not -- not something that's in my
25  -- in my wheelhouse.

Page 57

1      Q. You would agree with me that fuel was
2   released as a result of the damaged pipe.
3      A. Yes, that's the conclusion I've come to.
4      Q. And you would agree with me that the
5   damaged area of the pipe was near the crossover of
6   the new pipe and the existing pipe.
7      A. I -- I think within the near grassy area
8   of where the digging was, yes.
9      Q. And you would agree with me that there's a
10  scrape on the pipe.
11     A. Yes.
12     Q. And you would agree with me that the
13  scrape on the pipe is consistent with damage induced
14  by hydraulic equipment.
15     A. Yes.
16     Q. And you would agree with me that Talon was
17  operating hydraulic equipment in close proximity to
18  the damaged area of pipe on August 9th, 2011.
19     A. Yes.
20     Q. And you would agree with me that Talon
21  excavated in the immediate vicinity of the damaged
22  area of pipe on August 9th, 2011.
23     A. I guess it can be argued based on the
24  testimony what immediate vicinity -- but certainly
25  within six feet or thereabouts.

Page 58

1     Q. And you would agree with me that the pipe
2  was repaired.
3     A. That's what I've read, yes.
4     Q. And you would agree with me that the area
5  was remediated.
6     A. Yes.
7     Q. And you would agree with me that costs
8  were incurred in the repair of the pipe and the
9  remediation of the area.
10    A. I imagine there are costs associated with
11 them, but I don't know what the costs are.
12    Q. Mr. Phaendtner, in your opinion, did an
13 excavator bucket scrape the pipe?
14    A. I -- I think that's the most likely cause
15 of the -- of the damage to the pipe, yes.
16    Q. In your opinion, it just was not the Talon
17 excavator bucket. Correct?
18    A. That's correct.
19    Q. Okay. You are not saying that an
20 excavator bucket scraping the pipe is okay. Correct?
21    A. No, not at all. No.
22    Q. An excavator bucket scraping a pipe is not
23 okay. Correct?
24    A. It -- it's an un -- undesirable thing,
25 yes.

Page 59

1     Q. Would an excavator bucket scraping a pipe
2  comply with standards such as industry standards or a
3  standard of care of an excavator?
4     A. Could you repeat that, please.
5     Q. Sure.
6        Would an excavator bucket scraping a pipe
7  comply with standards?
8     A. Are you asking if -- if that's allowed by
9  any standards? I -- I would be doubtful if any
10 standard said you may strike this pipe with a -- with
11 an excavator bucket.
12    Q. Standards would likely be in place to
13 prevent an excavator bucket from scraping a pipe.
14 Correct?
15    A. I -- my -- I haven't seen any standards
16 that specifically mention excavator buckets, whereas
17 I would imagine the language would be more, you know,
18 care should be exercised in -- in working around
19 pipes.
20       I mean, I -- but -- but -- I don't -- I
21 don't recall any specific language in -- in codes or
22 anything.
23    Q. Well, in the exercise of care in
24 excavating around a pipe would include not striking
25 the pipe. Correct?

Page 60

1     A. Yes.
2     Q. Okay. In your opinion, the scrape was
3  created at an earlier time. Correct?
4     A. Yes, prior to the work done by -- by
5  Talon.
6     Q. Do you know how long the pipe had existed
7  with the scrape?
8     A. No.
9     Q. Could the pipe have existed with the
10 scrape for an extended period of time?
11    A. Yes.
12    Q. And what do you base that opinion on?
13    A. Well, the fiberglass material is generally
14 more inert than say a buried steel pipeline in that
15 it doesn't corrode in the -- in the conventional
16 sense of -- of iron or steel corroding.
17       The -- its -- its primary degradation
18 might be from ultraviolet light from the sun. This
19 particular pipe was -- was buried so I don't -- it --
20 it -- it -- it seems unlikely that there were any
21 modes of degradation present for this type of
22 material.
23       So a -- a scrape like that could exist for
24 very long periods of time without really any -- any
25 observable change other than -- well, other than the

Page 61

1  physical damage being preserved over time without
2  changing.
3     Q. Do you have any evidence of what created
4  the scrape on the pipe at an earlier time?
5     A. What evidence created the scrape?
6     Q. Do you have any evidence of what created
7  the scrape on the pipe?
8     A. Well, my -- my opinions on that are
9  generally related to the -- the morphology of the --
10 of the scrape. It's -- it's consistent with a tooth
11 of -- of a -- of an excavator bucket.
12       I imagine there could be some other
13 tooth-shaped object that was put down there at some
14 point in time, but -- but it seems most logical that
15 it was some kind of digging equipment that had teeth
16 on it.
17    Q. Do you have any evidence of when the pipe
18 was scraped?
19    A. No. And -- and -- and I believe that to
20 be unknowable -- unknowable from observation of the
21 -- of the pipe itself.
22       You know, there -- there might be records
23 buried somewhere on that base that -- that give an
24 indication of something. But -- but in terms of
25 physical evidence, it -- it's -- it's most likely

16 (Pages 58 to 61)

Case 7:13-cv-00021-BO   Document 71-3   Filed 06/12/14   Page 17 of 20

Page 62

1  unknowable.
2     Q.  In your opinion, is the scrape on the pipe
3  that was caused at an earlier time, is that damage
4  located at the crossover point?
5     A.  I -- I've -- I've read that but I -- I'm
6  not -- I don't know if -- how factual that is,
7  whether it's just simply one of the parties stating
8  that it happened at the crossover point.  I'm not
9  sure what that's based on.  But I -- I do recall
10  reading discussion of it being at or near the
11  crossover point.
12     Q.  Okay.  I'm going to hand you what we'll
13  mark as Exhibit 3.
14         (* Exhibit 3 was marked *)
15     Q.  And this is your supplemental report on
16  the failure of the New River MCAS-FRP pipe.
17     A.  Yes.
18     Q.  The report is dated April 29th, 2014.
19  Correct?
20     A.  Yes.
21     Q.  And April 29th, 2014 was yesterday.
22  Correct?
23     A.  That's correct.
24     Q.  Okay.  Did you finalize your opinions
25  yesterday?

Page 63

1     A.  No.  I think the -- the -- the bulk of my
2  opinions expressed in my reports were mostly
3  finalized some months ago.
4        The reason that this report was finalized
5  only yesterday was -- it had to do primarily with the
6  calculations done by -- by Chris Brand, my colleague
7  at Crane Engineering.
8     Q.  So the report that was produced yesterday
9  does contain new information.  Correct?
10     A.  It -- certainly it -- there -- there's
11  some new information since my -- my first report.
12  But all the information is fully consistent with my
13  opinions from -- from the first report.  I -- I --
14  I've -- I've found nothing new that would contradict
15  previous opinions.
16     Q.  The report produced yesterday contains an
17  analysis that had not been previously produced.
18  Correct?
19     A.  Certain -- the finite element analysis,
20  yes.
21        And actually, these last figures here,
22  figure 15 and 16 were produced yesterday morning.
23     Q.  Okay, and Mr. Pfaendtner, to the extent
24  that there is new information in your report that we
25  received yesterday, we would just like to reserve our

Page 64

1  right to talk to you about that at a later date.
2     A.  Absolutely, yes.
3     Q.  You mentioned that you had a mechanical
4  engineer assist you with this report.  Correct?
5     A.  Yes.
6     Q.  And is that Christopher Brand?
7     A.  Yes.
8     Q.  Okay, and Christopher Brand works with
9  Crane Engineering.  Correct?
10     A.  Yes.
11     Q.  And how long has Mr. Brand worked with
12  Crane Engineering?
13     A.  It's been on the order of two years.
14     Q.  Prior to joining Crane Engineering, was
15  Mr. Brand a student or was he employed elsewhere?
16     A.  He was employed elsewhere.
17     Q.  Okay.  Do you know how long he's been a
18  professional engineer?
19     A.  Certainly I think he's had his license --
20  he had it at the time he joined Crane Engineering.
21  I'm not sure what year he -- he received his license.
22     Q.  Do you know whether Mr. Brand had been
23  employed as a professional engineer prior to joining
24  Crane Engineering?
25     A.  Well -- well, you don't need to be a

Page 65

1  professional engineer in order to practice
2  engineering.  It's -- he worked for another
3  engineering firm prior to that.
4        And generally, if you work for an
5  engineering company, you don't need an individual
6  license, so I worked at General Electric as a -- an
7  engineer without my license.  It was only during my
8  time at GE that I got my PE license.
9     Q.  There's a period of time where you have to
10  train as an engineer prior to getting your license.
11  Correct?
12     A.  Yes.  There's a -- a -- an experience
13  component.  It -- first you take the -- the
14  fundamentals of engineering test, which you can take
15  immediately after you graduate with your
16  undergraduate engineering degree.
17        And then there's -- depending on whether
18  you go to graduate school or not there's a -- a
19  several year period of -- of gaining experience
20  before you can sit for the engineering test.
21     Q.  Do you know whether Mr. Brand was
22  completing that experience component in order to
23  obtain his professional engineering license prior to
24  coming to train -- Crane Engineering?
25     A.  I don't know that.

Atlantic Professional Reporters - 800-717-0001

Page 66

1    Q. Okay. I believe you testified Mr. Brand
2  was involved in the finite element modeling. Is that
3  correct?
4    A. Yes.
5    Q. Okay, was he involved in any other aspect
6  of the analysis that is described in this report?
7    A. He was not involved in the physical
8  testing of the pipe that's described in this report.
9        He mainly reviewed the -- the -- I believe
10 the MDE report and -- and enough material to
11 understand the dimensions of the subject pipe, it's
12 -- the -- the mechanical properties of the subject
13 pipe as inputs into his finite element analysis.
14    Q. Do you recall when you were asked to
15 perform the final -- finite element modeling?
16    A. I -- I would say it's in the -- in the
17 last month.
18    Q. And ---
19    A. --- As a recommendation -- I'm sorry -- it
20 was my -- my recommendation that it be done.
21    Q. And why did you recommend that the finite
22 element modeling be done?
23    A. In part it was in rebuttal to Mr.
24 Manning's opinions.
25        In particular, the figure nine in his

Page 67

1  report as -- as well as just simply a -- a -- a
2  demonstration of the mechanics of interaction between
3  a -- a bucket and the shape of that bucket with --
4  with a pipe such as the subject fiberglass pipe.
5    Q. Okay, and when did you perform the finite
6  element modeling?
7    A. I -- I believe Mr. Brand's been working on
8  it over the past two weeks or so.
9    Q. Okay, and what data does Mr. Brand use in
10 order to perform that analysis?
11    A. I don't know what specific information he
12 used.
13        But the general inputs into a finite
14 element analysis are -- are things like the
15 dimensions of -- of the components, so the dimensions
16 of the subject pipe. It's a six-inch fiberglass
17 pipe. It has a certain wall thickness. It has
18 certain elastic properties.
19        And then he -- he models the impingement
20 of, you know -- of -- of a feature meant to replicate
21 a bucket whether it's a tooth or a straight blade,
22 the dimensions of that.
23        So again, it -- its -- its -- its
24 dimensions and material properties that are -- that
25 are inputs with things that are called boundary

Page 68

1  conditions.
2    Q. You mentioned that Mr. Brand obtained the
3  dimensions of the subject pipe from the MDE report.
4  Correct?
5    A. I don't know exactly whether he used my
6  measurements from my inspection or the MDE report. I
7  don't recall there being any conflict between the
8  measurements. But it -- I would say between my
9  measurements, the MDE report measurements, and the --
10 what was available -- what literature was available
11 on this particular pipe, you know, I'm sure he drew
12 from those sources.
13    Q. What were his sources for the measurements
14 of the finishing edge and the tooth?
15    A. The -- the -- the -- the size of the
16 tooth, he -- he took that from the -- the size of the
17 tooth that we used our physical testing which
18 was about three and a quarter inches.
19        The -- the size of the finishing edge, I
20 believe he just took some length that -- that
21 extended -- was larger than the -- than the -- the --
22 the diameter of the pipe.
23    Q. And the data that Mr. Brand collects is
24 entered into a computer software program. Correct?
25    A. Right. In finite element you essentially

Page 69

1  paint a picture of the scenario, again, the
2  dimensions and you want the -- the bucket to come
3  down a certain displacement.
4        And then -- then you let the computer
5  calculate giving your inputs and using physics, you
6  know, what's -- what's the -- the physical response
7  of this material of being pushed on in a certain way.
8  It -- it calculates what the stressors are, what the
9  displacements are after -- after that action.
10    Q. Would Mr. Brand also have to input data
11 that relates to the force exerted on the pipe or the
12 angle at which that force is being exerted?
13    A. Those can be inputs. You -- you can --
14 you can specify a force or a displacement. So the --
15 the inputs can vary.
16        So you -- you can apply a displacement and
17 measure a result in force, or apply a force and
18 measure a result in displacement.
19    Q. Do you know if Mr. Brand entered variables
20 such as the force or the angle or things of that
21 nature?
22    A. I haven't had specific discussions on --
23 on those details. But I think studying the outputs
24 of -- I -- I -- I believe the -- the tooth or the
25 bucket was -- the force was applied perpendicular to

18 (Pages 66 to 69)

Page 70

1  the axis of the pipe. And -- and he did -- he did
2  apply displacement as opposed to a force ---
3      Q. --- Okay.
4      A. --- In his calculations. Although, I -- I
5  -- certainly we can produce all that if -- if
6  requested.
7      Q. Yeah, that would certainly be helpful.
8  And I know we probably need a compatible computer
9  software program. But that would be helpful to go
10 ahead and get that.
11     A. Right. Well, yeah, there are various
12 levels. But certainly we can supply you on a piece
13 of paper the inputs.
14         But yeah, you would need a compatible
15 software in order to -- to run the simulation
16 yourself based on what his inputs are, but it's
17 certainly doable.
18     Q. Okay, that would be very helpful.
19         Do you know if Mr. Brand was able to
20 account for the restraint on the pipe in the
21 simulation?
22     A. So you're talking about boundary
23 conditions. I -- I would have to check to see what
24 boundary conditions he used.
25     Q. So you don't know if he modeled the pipe

Page 71

1  with soil around it.
2      A. I don't know at this point, no.
3      Q. So based on the modeling, you concluded
4  that the deformation created by the straight edge is
5  different than the deformation created by the tooth.
6  Correct?
7      A. The elastic response of the pipe is
8  different for sure.
9      Q. And what do you mean by elastic response?
10     A. Well, what -- there -- there's an inherent
11 difficulty in -- in modeling composite materials
12 because they're -- they're an isotropic, which means
13 you have fibers going in certain directions, whereas
14 if it were a metal pipe, you have this -- it's called
15 -- it's called anti -- iso -- anti -- isotropy. It's
16 -- it's isotropic, meaning, you -- you have no
17 directionality in the properties.
18         So -- so the material loss -- so the --
19 the equation that -- that governs the -- the behavior
20 of the material, how it stretches and how it deforms
21 is very simple for a metal pipe, but it's extremely
22 complex for something like a -- a fiberglass pipe.
23         So that said, it becomes very difficult to
24 model damage to the pipe. What is easier is simply
25 to model the elastic response, so simply deforming

Page 72

1  the pipe without -- without actually damaging it. So
2  he -- he was not able to model actually scraping the
3  pipe. He just ---
4      Q. --- Uh-huh.
5      A. --- Simply indented the pipe because we
6  don't know what the -- what the constitutive
7  relationship is -- what the equation is that -- that
8  governs the damage to the pipe. 'Cause it's -- it's
9  extremely complex and -- and maybe even undoable from
10 a modeling standpoint. And that's why we did the --
11 the physical testing.
12         But again, the finite element was mainly
13 to address Mr. Manning's figure nine, which I think
14 is -- was simply -- simply a -- a thought
15 process or thought exercise on his part where he just
16 drew it by hand and -- and didn't have any modeling
17 involved.
18     Q. So is it more accurate to say that based
19 on the modeling, it's your conclusion that the
20 elastic response created by the straight edge is
21 different from the elastic response created by the
22 tooth.
23     A. Yes.
24     Q. Okay. Are there any other conclusions
25 that you have as a result of the modeling?

Page 73

1      A. Well, it -- it -- it certainly reinforces
2  the opinions that I expressed in my initial report,
3  that in order to get the shearing of the fibers, the
4  cutting of the fibers -- to -- to end up in -- with
5  this well-defined scrape, which is actually a trough
6  in the material -- materials removed by the bucket --
7  to get the -- the well-defined cutting of the fibers,
8  you need a -- a corner of some -- of some kind to --
9  to shear the fibers.
10         And -- and -- and so this -- this simple
11 finite element model gives a -- gives an indication
12 that, yes, those -- those shear forces are going to
13 be acting there whereas -- whereas you don't really
14 see it on the -- with the straight edge.
15         So it -- it's -- it's -- it essentially
16 reinforces the -- the original opinion that the only
17 way you can cut the fibers is if you have a --
18 sharp corner dragging across that surface.
19     Q. Okay. I would like to ask you some
20 questions about the physical testing that you did.
21     A. Okay.
22     Q. Did you happen to film the operation of
23 digging the trench, laying the pipe, backfilling the
24 trench, and compacting the soil?
25     A. Those were captured in photographs. The

19 (Pages 70 to 73)