Page 74

1   -- we -- we have quite a bit of video but it's of the
2   actual testing.
3         But -- but the photographs document the
4   initial trench before the pipe went in and then the
5   act of placing the pipe in and -- and compacting soil
6   around it.
7         Q.  And were those photographs of the initial
8   procedures produced this morning on the jump drive?
9         A.  Yep.  All my photographs are on the jump
10  drive as well as the video.
11        Q.  Okay, great.  Did you use new Ameron pipe
12  for the testing?
13        A.  Yes.  I -- well, I -- I don't know the
14  pedigree of the pipe.  I -- I understand there was
15  some difficulty in getting true exemplary pipe.  So I
16  -- I don't know what vintage it was but it certainly
17  appeared that it was -- it had not been used.  It may
18  have been sitting on -- on -- in some warehouse
19  somewhere for some time.  So I -- I don't know the
20  pedigree.
21        Q.  What difficulties did Crane experience in
22  obtaining the pipe?
23        A.  Well, it wasn't so much difficulty as --
24  as we went through Talon and -- and they supplied the
25  pipe to us.

Page 75

1         I don't know if they had it in their
2   inventory or if they got it from one of their
3   suppliers, but I -- I don't recall the details.  But
4   it might have been simply that pipe isn't made
5   anymore, so the inventory just didn't exist.  So we
6   -- we received one -- one length of it.
7         Q.  So Crane did not obtain the pipe.
8         A.  No.  It was -- it was shipped to us.
9         Q.  It was shipped to Crane by Talon?
10        A.  Umm, I -- I think it was Talon who shipped
11  it to us.  And they didn't ship it to Crane.  They
12  shipped it to the site where we did the testing.
13        Q.  Okay, so you don't know precisely where
14  the pipe came from.
15        A.  No, other than I believe that Talon
16  procured it for us.
17        Q.  And you do not know the age of the pipe.
18        A.  I do not.  And I'm -- I'm trying to recall
19  if we have -- if we have those records or not.  I --
20  I -- I don't recall.
21        Q.  Did anyone with Crane contact Ameron?
22        A.  I had a -- I had a conversation with one
23  of their engineers by -- by phone.
24        Q.  Do you recall the name of that engineer?
25        A.  I'll -- I'll have to look it up.

Page 76

1   (Witness examined document)
2         A.  It was Mr. Hector Mercado.  I had a phone
3   call with him on October 6th of 2011.
4         Q.  Did you initiate the phone call with Mr.
5   Mercado?
6         A.  I -- I believe I did, yes.
7         Q.  And what was your purpose for initiating
8   that phone call?
9         A.  It -- it was primarily to understand
10  materials of construction.  What are the fibers, what
11  is the resin, how is the pipe wound.  Because at that
12  point, I -- I -- I don't believe I had seen the --
13  the actual -- the subject pipe.  So I -- I was --
14  essentially an inquiry to understand what this pipe
15  looks like.
16        Q.  Do you recall talking with Mr. Mercado
17  about anything other then the qualities of the pipe?
18        A.  I wouldn't call it qualities of the pipe.
19  It -- it's ---
20        Q.  --- Okay.
21        A.  --- It's properties of the pipe.  No, it
22  was ---
23        Q.  --- Thank you.
24        A.  --- Simply just the properties of -- and
25  -- and with -- within reason, obviously, he's not

Page 77

1   going to give away any manufacturing secrets.  But
2   basically it's just what are the -- what's it made of
3   and generally how is it made.
4         Q.  When you spoke with Mr. Mercado, did you
5   request a sample of the pipe or a length of the pipe?
6         A.  I -- I don't recall.
7         Q.  Did you ask Mr. Mercado if the pipe had
8   changed or been modified in any way in the past 30
9   years?
10        A.  I -- I may have asked him that.  But I --
11  I don't know whether I did or not.
12        Q.  So you don't recall whether Ameron had
13  changed or modified the manner in which the pipe was
14  manufactured in the past 30 years -- or changed or
15  modified the properties of the pipe in the last 30
16  years?
17        A.  No.  I -- again, I may have asked that but
18  my understanding is that this is a series 2000 pipe.
19  And so it generally -- large changes aren't -- aren't
20  usually made.
21        But they have other lines, you know, they
22  have a 7000 series which is carbon fibers as opposed
23  to glass fiber.  So generally if -- if there's a
24  large change, they just assign a different name to it
25  or -- or a different type.

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 1 of 21

**Page 78**

1   Q. When you obtained -- or more correctly
2 received -- the Ameron pipe, did you notice any
3 differences between that sample length and the
4 subject pipe?
5   A. Well, we received a 20-foot length of pipe
6 whereas the -- the subject pipe, I think, was
7 on the order of three feet or so in length. So it --
8 I mean, it was -- it was cut from the pipeline. So
9 it -- it wasn't -- obviously wasn't the original
10 length.
11   Q. Right. Aside from the length, were -- did
12 you observe any differences in the sample pipe and
13 the subject pipe?
14   A. No. It looked nominally similar.
15   Q. In the testing that Crane performed, it
16 used a John Deere 200CLC excavator. Correct?
17   A. That's what the -- the quarrying company
18 owner told me it was. I don't think there were any
19 markings on it to -- to indicate that other than it
20 was a John Deere.
21   Q. So you're relying on the quarrying owner
22 to indicate the equipment that was used?
23   A. Well, in part. But I also had -- he
24 supplied -- I -- I believe, the specs for it. And so
25 certainly what I saw that day consistent with

**Page 79**

1 what -- what -- what the brochure said.
2   Q. Okay. Was that the same type excavator
3 that was used by Talon at the MCAS New River Project?
4   A. Umm, I believe they are different
5 manufacturers. I believe the -- the Talon excavator
6 was a little bit smaller.
7   Q. So the excavator that was used by Talon at
8 the MCAS New River Project was smaller than the one
9 used in Crane's testing?
10   A. I -- I believe in -- in gross weight it
11 was smaller. But in terms of horsepower, length of
12 the boom, size of the bucket, I -- I -- I -- my -- I
13 don't have -- I don't have that readily available
14 right now.
15   Q. Do you have measurements -- strike that.
16   When you say length of the boom, are you
17 referring to what a lay person would call the arm of
18 the excavator?
19   A. Right. Yeah, yeah.
20   Q. Okay.
21   A. Yeah, the thing that the bucket's attached
22 to.
23   Q. I want to make sure that we're on the same
24 page.
25   Do you have measurements of the length of

**Page 80**

1 the boom for the Talon excavator?
2   A. I don't.
3   Q. And do you have measurements for the
4 length of the boom of the John Deere excavator?
5   A. I don't.
6   Q. Do you know why a different type and size
7 excavator was used in Crane's testing?
8   A. It -- it came down to availability. And
9 -- and not so much availability of the excavator, but
10 the availability and willingness of a contractor to
11 modify their bucket to -- to suit our needs. Because
12 the -- this testing required physical modification to
13 the bucket to -- to accommodate what we were -- what
14 we were doing on the testing.
15   And -- and so you know, my -- my -- my
16 view of -- of the -- the size of the excavator was --
17 was less important because it was, both excavators,
18 the Talon one and then the -- the quarrying
19 excavator, are both capable of -- of supplying much,
20 much more force than we would ever need.
21   You know, they could have crushed the pipe
22 in both instances, so -- so supply of force wasn't an
23 issue. It was just simply getting the -- the
24 characteristics of the bucket, which is what we
25 wanted.

**Page 81**

1   Q. What was the size of the bucket on the
2 Talon excavator?
3   A. I believe it -- I think -- I believe it
4 was about 24 inches but I'll have to check the -- the
5 photographs.
6   If you want to wait, I can see if I can
7 find it.
8   Q. Sure.
9   (Witness examined document)
10   A. You know, I would have to -- here we go.
11 It was nominally 24 inches -- 23 inches.
12   Q. What was the size of the bucket used for
13 Crane's test?
14   A. Umm, that -- that's the width of the
15 bucket.
16   Do you mind if I start up my computer,
17 'cause that's -- that's the only way I'll -- I'll be
18 able to ---
19   Q. --- Not at all.
20   A. I -- I don't have a direct measurement of
21 it. But it -- judging from the photographs, it's --
22 it's about a -- a 36-inch width bucket.
23   Q. So the size of the bucket on the Talon
24 excavator and the size of the bucket used for the
25 test were different. Correct?

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 2 of 21

1    A. Yes.
2    Q. Why is that?
3    A. Well, it's basically what we had. And
4  again, the -- the size of the bucket isn't -- isn't
5  so important as what the -- what the leading edge
6  looks like and the force that you can apply.
7    So the -- the important part of this was
8  having the bucket with certain features on the -- on
9  the leading edge. The size of the bucket doesn't
10 matter. And -- and really the -- the general size of
11 the excavator didn't matter in -- in our view.
12   Q. What was the length of the finishing edge
13 on the Talon excavator?
14   A. It spanned the -- the width of the -- of
15 the bucket, so about 20, 23, 24 inches.
16   Q. What was the length of the finishing edge
17 on Crane's test?
18   A. I'd say between 20 and 24 inches.
19   Q. Was a measurement taken at the time of the
20 test?
21   A. I can -- I can measure from my photograph,
22 but -- I measured the width of the tooth. And then
23 based on the width of the tooth I can infer the other
24 dimensions if I had a -- a ruler, but I didn't place
25 a tape measure on the -- on the bucket itself.

1    Q. Okay. How was the finishing edge attached
2  to the teeth on the Talon excavator?
3    (Witness examined document)
4    A. Well, the Talon excavator had teeth
5  itself. The -- the -- the finishing edge was applied
6  to the end of the teeth.
7    I'm not sure of the physical mechanism by
8  which it -- it was attached. But -- you know,
9  whether it was by welding or whether it was integral
10 with the teeth. I'm -- I'm -- I'm not sure.
11   Q. How was the finishing edge attached to the
12 teeth on the Crane's test?
13   A. By -- by welding.
14   Q. Okay. So it may be that the finishing
15 edge on a Crane excavator was attached in a different
16 manner than the finishing edge on the excavator used
17 in your testing?
18   A. Well, I -- I'm -- I imagine so. They are
19 two different -- but they -- they certainly were
20 rigidly attached.
21   Q. Do you know why a different method of --
22 excuse me -- of attachment may have been used?
23   A. No. And a lot of times these are -- these
24 are functions that are performed in the field, field
25 modification. So again, it's probably a case by case

1  basis as to how they're attached.
2    Although, I do know the -- generally the
3  teeth are removable and they're held in place with a
4  pin.
5    Q. What was the width of the tooth used for
6  scraping in Crane's testing?
7    A. It was nominally three and a quarter
8  inches.
9    Q. Okay. In your initial report do you opine
10 that a four-inch object made the scrape?
11   A. It appeared that a -- a nominal four-inch
12 object had -- had induced the damage, yes.
13   Q. So why not use a four-inch tooth in your
14 testing?
15   A. It came down to availability. What we had
16 was a three and a quarter inch, and from an
17 engineering mechanic standpoint, it's -- the affect
18 would be similar whether it's three and a quarter or
19 four inches.
20   Q. Did you ever physically examine the Talon
21 excavator and finishing edge?
22   A. I did not, no.
23   Q. Is your knowledge of the Talon excavator
24 and finishing edge based on photographs?
25   A. Yes.

1    Q. And you produced all your photographs to
2  us today?
3    A. Yes, but not necessarily the -- the
4  photographs I -- actually, I think they're in there.
5    I received photographs as part of
6  discovery and I believe that they're all on that
7  thumb drive.
8    Q. Did you receive photographs from Talon as
9  part of discovery?
10   A. I -- I may have. But the -- I received
11 emails from -- from -- from Clyde Williamson of Talon
12 as part of the normal, I guess, correspondence, and I
13 do believe that some attachments were sent by -- by
14 him.
15   Q. Okay.
16   A. And those emails are part of the -- the
17 file.
18   Q. Okay.
19      MS. GAVALIER: It's 12:30. Lunch is
20 here, so I would say let's take a break.
21      THE WITNESS: Okay.
22      (12:32-1:01 p.m. - Luncheon recess)
23   Q. (Ms. Gavalier) All right, Mr. Pfaendtner,
24 prior to our lunch break we were talking about your
25 August 29th, 2014, report and some of the details

**Page 86**

1    about the procedures that were employed, so I would
2    like to just pick up there and continue with that
3    line of questioning.
4              After you backfilled the trench, did you
5    measure the soil compaction?
6         A.   No.
7         Q.   So you don't know the percent compaction
8    of the soil after you backfilled the trench?
9         A.   No.
10        Q.   Did you measure the soil compaction during
11   your test?
12        A.   No.  We didn't measure soil compaction
13   other than having compacted it.
14        Q.   And how did you compact the soil?
15        A.   With a -- I'm not sure what the device is
16   called, but it's -- it's a little thumper that --
17   it's an automated compactor.  So an operator pushes
18   it around and -- actually it's shown in the
19   photographs.
20        Q.   So at no point during the testing was the
21   soil compaction measured?
22        A.   No.
23        Q.   Do you know the percent compaction of the
24   soil around the pipe in question at the time of the
25   incident?

**Page 87**

1         A.   No.
2         Q.   So you do not know the percent compaction
3    of the soil around the pipe in question at the time
4    of the incident?
5         A.   No.
6         Q.   So since you didn't test the compaction of
7    the soil and you don't know the compaction of the
8    soil near the damaged pipe, you weren't able to
9    compare the compaction of the soil?
10        A.   No.
11        Q.   Do you feel that the compaction of the
12   soil was relevant to your analysis?
13        A.   I -- I think the -- the compaction of the
14   soil would have one way or another certainly
15   influenced the -- the calculation.  In particular,
16   you know, the figures 15 and 16 to some degree.
17             But the -- you know, the -- the --
18   certainly the general shape of -- of the deformation
19   would have remained the same.
20        Q.   So you said the soil compaction would have
21   influenced the calculation.  And you're referring to
22   those calculations in figure 15 and 16.  Correct?
23        A.   Right.
24        Q.   Would the soil compaction also have
25   impacted the physical testing that you did?

**Page 88**

1         A.   I think primarily to the degree that had
2    we not compacted the soil, the -- the pipe may have
3    wandered around.  So our -- our primary reason for
4    burying it was so that it stayed in one place while
5    we contacted it with the -- the excavator.
6         Q.   How much force did the finishing edge
7    apply to the pipe during the testing?
8         A.   I don't know that.  We -- that was
9    unmeasurable other than the operator conducted the
10   four tests.  The -- the excavator operator conducted
11   the four tests in a nominally similar manner, which
12   includes application of force.
13        Q.   So the application of force was determined
14   by the excavator operator?
15        A.   Well, he and I had eye contact.  Certainly
16   he was coming down, as you'll see in the video.  You
17   know, we had to find the pipe first.  It was buried
18   in soil.
19             But -- but basically it was -- it was by
20   his -- his feel.  And -- and, you know, for -- for
21   some tests I -- I wasn't convinced that there was
22   enough pressure, so I asked him to -- to -- to apply
23   more pressure in both instances, both the -- the
24   straight edge and the tooth ones.
25        Q.   Was the objective to have the same amount

**Page 89**

1    of force applied during each of the four simulations?
2         A.   Nominally, yes.  But since we don't have
3    a force measurement it's -- it's really all visual
4    feedback.  Excuse me.
5         Q.   And you were relying on the operator of
6    the excavator to apply a similar force in all four
7    simulations?
8         A.   Right.  Essentially, yes.  Sorry.
9         Q.   Do you need a quick break?
10        A.   Well, I don't know what's going to help.
11             MR. REICH:  Some candy, perhaps?
12             THE WITNESS:  Candy -- yeah.
13             MR. REICH:  Let's see what we have
14   here.
15             THE WITNESS:  How about one of the
16   mints?
17             MS. GAVALIER:  Just let me know if
18   you need a break.
19             THE WITNESS:  No, go ahead.
20             MS. GAVALIER:  When I get a tickle
21   in my throat I end up in tears, so...
22        Q.   (Ms. Gavalier)  Did you try to quantify
23   how much relative force was applied by the finishing
24   edge in the vertical and horizontal positions when
25   the bucket came in contact with the pipe?

23 (Pages 86 to 89)

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 4 of 21

Page 90

1     A. Yes. We were -- again, but it was all
2 qualitative. It was -- the -- the feedback was
3 visual, so it -- we wanted a certain -- we wanted at
4 least see consistent displacement of -- of the
5 downward displacement.
6     So as, you know, figures 15 and 16 show,
7 there was certainly deformation, --visible
8 deformation of the pipe that you can see in the
9 videos. So we were -- for the -- after the same
10 nominal deformation.
11     Q. So is it fair to say that in addition to
12 relying on the operator of the excavator to determine
13 the amount of force exerted on the pipe, you were
14 also using visual cues of the pipe deforming?
15     A. Well, that was my visual cue. I had some
16 -- I had line of sight contact with the operator.
17 And so I was just visually confirming or verifying
18 that -- that these were done in nominally the same
19 manner.
20     And -- and so if you watch the video
21 you'll -- you'll see me motioning to -- to come again
22 and -- and do it again with -- with more downward
23 force, again, going for this uniformity.
24     And -- and that is one difference that
25 you'll see. There are multiple contacts for each

Page 91

1 test, whereas certainly the subject one was probably
2 just a single stroke that caused the damage.
3     Q. And the questions I've just posed related
4 specifically to the finishing edge.
5     A. Uh-huh.
6     Q. Would the discussion that we just had
7 apply to the testing done with the tooth as well?
8     A. No. My -- my responses were all in
9 general across all -- all four tests.
10     Q. Okay. I just wanted to make sure we were
11 clear.
12     Do you know the magnitude of force on the
13 pipe in question that caused the damage to that pipe?
14     A. I don't know.
15     Q. Okay. So you don't know what force was
16 exerted by the hydraulic equipment that potentially
17 damaged the pipe?
18     A. We can probably bound that force via the
19 finite element calculations because, obviously,
20 stress is one of the outputs. So we could take that
21 stress and -- and back out a force required to get
22 those deformations.
23     But again, it's -- it's -- it's difficult
24 in that the composite pipe is difficult to model. So
25 conversely if we really wanted to know the force we

Page 92

1 could, you know -- or maybe a strain gauge or
2 something, the -- the bucket to determine the force.
3     Q. And when you say you would back out of it,
4 would you first try to model the damaged pipe, and
5 then kind of work backwards to figure out what the
6 force would have been?
7     A. Right. We would -- well, the -- the --
8 the testing we did with the tooth was the only one
9 that produced damage similar to the subject pipe.
10     So what we would do is -- is get to a
11 point where we create a gouge that gave us similar
12 features as the subject one, and then either measure
13 the force in -- in that -- in that case.
14     Q. So you feel like the force exerted on the
15 pipe by the tooth in your testing could be determined
16 by kind of working backwards and using the modeling?
17     A. Well, either case. Right. So I -- I
18 guess the simple approach is -- is to -- is to look
19 at the -- the -- the deformation of the pipe from the
20 testing.
21     And then look at how far down the tooth
22 deforms the pipe in the sense of figure 15 or 16.
23 And then have the -- have the computer tell us what
24 the restoring force is.
25     So obviously this thing wants to bounce

Page 93

1 back to its original shape, but we can calculate what
2 that force is pushing this thing back to its original
3 shape.
4     Q. Would the amount of force on a pipe change
5 the pattern of the damage?
6     A. Yes, but also depending on what the shape
7 of the -- of the indenter is or the object causing
8 the damage. And -- well, go ahead.
9     Q. Do you know how the excavator operator
10 that damaged the pipe had moved the bucket?
11     A. The subject pipe?
12     Q. Yes.
13     A. It -- it's -- it's fairly apparent that it
14 was an axial movement of the bucket.
15     So along the axis of the pipe because you
16 can sort of see lead-in scratches, as there was sort
17 of low -- lower contact forces were sort of
18 scratching the surface.
19     And then it went deeper and then actually
20 created the gouge and then came back out again.
21 Because generally, scooping with an excavator isn't
22 -- isn't a linear -- you know, it doesn't go down
23 then across.
24     It's -- it's -- it's a scooping motion, so
25 the amount of force applied is -- is variable over --

Atlantic Professional Reporters - 800-717-0001

Page 94

1     over the stroke.
2          Q.  Do you know how the excavator operator
3     moved the bucket in your testing?
4          A.  Well, I gave general -- you know, just
5     through digging motion.  You know, I didn't -- I
6     didn't try to control, you know, how he digs a trench
7     or anything like that.
8          Q.  Do you know what the angle of the bucket
9     was when you scraped the pipe with the finishing
10    edge?
11         A.  The angle of the -- or the pitch of the
12    bucket?
13         Q.  Yes.
14         A.  In our testing?
15         Q.  Yes.
16         A.  I suppose we could measure it from the
17    photographs and the video.  But it was sort of a --
18    more or less a normal -- normal with respect to the
19    -- the pipe, so perpendicular to the pipe.
20         Q.  Okay.  Was the same angle used for all the
21    simulative testing?
22         A.  Yes.  And again, it -- you know, it --
23    it's going to be fairly insensitive to contact angle
24    because the -- the thing is rounded, both the tooth
25    and -- and the finishing edge are rounded.

Page 95

1          So -- so whether, you know, you have a
2     forward or backward angle it -- it's still going to
3     impart, you know, sort of the same effect on the
4     surface.
5          Q.  Did you think about changing the angle?
6          A.  No, no.  We were -- our -- our -- our goal
7     was to establish the -- the main effect of -- of the
8     different geometries, which we hypothesized to exist
9     ahead of time.
10         Mainly the -- the -- the tooth gives you
11    that shear just like scissors when you're cutting --
12    cutting paper or something.  It's that shear that
13    allows you to -- to cut whether it's cloth, fiber or
14    paper to get a -- a -- a fairly straight cut to those
15    -- those -- those fibers were sheared.
16         So the only way to get the shear is to
17    have a -- a corner.  And so that was our -- our
18    hypothesis going in as reflected by my first report,
19    that you need the shear.
20         And so the -- the -- the -- you know, the
21    main goal of the testing was testing that shear, so a
22    tooth versus a straight edge.
23         Q.  When you did the testing with the
24    finishing edge, was the finishing edge perpendicular
25    to the pipe?

Page 96

1          A.  I think you asked that already and, yes,
2     nominally perpendicular.
3          Q.  Did you consider changing the angle of the
4     finishing edge so that it was not perpendicular to
5     the pipe?
6          A.  No.  For reasons I just discussed in that
7     the -- the effect should be less sensitive to the --
8     the -- the -- the angle of the bucket, because the
9     leading edge of the -- of the tooth and the -- and
10    the straight edge are -- are rounded.
11         So again, the -- the -- the local
12    mechanics of where this thing touches the surface of
13    the pipe are going to be more or less the same.
14         And -- and the shearing feature is going
15    to be the same because you have that right angle
16    regardless of the -- of the -- of the pitch of the
17    tooth in its contact with the surface of the pipe.
18         Q.  And putting the pitch of the tooth aside,
19    did you consider changing the angle of the finishing
20    edge so that it was at a 45 degree angle or a 90
21    degree angle, to see what effect that may have?
22         A.  No.  No, we didn't explore that effect,
23    but certainly it can be and -- and I don't expect
24    there to be any from a -- just from an engineering
25    sense.  I don't see any important variables changing

Page 97

1     if you do that that will give you any different
2     result.
3          And -- and maybe had we had some more
4     exemplar pipe we -- we could have done more testing.
5          Q.  Did you use all of your exemplar pipe?
6          A.  Yes, we did.
7          Q.  I believe you describe the width of the
8     scrape on the subject pipe as nominally consistent.
9     Does that sound right?
10         A.  Yes.
11         Q.  To be clear, what do you mean by that?  I
12    think it's on page four, the last sentence under
13    testing of exemplar Ameron bondstrand 2000 pipe.
14         A.  Nominally consistent width.  That -- that
15    was in describing the -- the damage done by the --
16    the tooth testing.
17         So if you refer to picture or figures --
18    or figure nine -- yeah, figure nine.  The -- the
19    swath of -- of damage to the -- the top of the pipe
20    is -- is more or less uniformly in width.  You could
21    essentially, you know, define that damage with --
22    with two roughly parallel lines.
23         Whereas, the damage imparted by the -- the
24    straight edge, if you go back to figure -- figure
25    six, you -- you can see that no, you can't put

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 6 of 21

1  parallel lines. The -- this -- the deformation is
2  more oval shaped or -- or irregular.
3        And -- and that is due to the effect that
4  both Dr. Manning and I -- I think both explained,
5  that it has to do with the slight variation in the
6  force of the -- of the edge on the surface. The --
7  the more you push down the more contact area you're
8  going to have.
9        And so this -- this contact area here is a
10 function of length along the axis of the pipe. This
11 variation is -- is sort of a variation in how much
12 force was applied.
13        Whereas -- whereas with the tooth, the --
14 the width of the damage is simply defined by the
15 width of your tooth. If you push harder you don't
16 necessarily get more contact area, you just get more
17 force down on the tooth.
18        So that's what we saw on the subject pipe
19 is that you have this -- this -- this swath of damage
20 that is a fairly well-defined width across,
21 consistent with a tooth.
22        It's -- it's more or less independent of
23 -- of -- of the force applied. It just simply, you
24 know, you -- you -- you put a thick swift object down
25 and scrape it across, your damage is going to be

1  defined by the width of that tooth, whereas in the
2  finishing edge, you have this -- the finishing edge
3  that's wider than the diameter of the pipe.
4        So the contact area is going to vary by
5  how much force is there. So you get this -- this --
6  again, back to figure -- figure six.
7        The -- the variation is simply due to the
8  variation in the force applied. There is nothing
9  about the finishing edge that -- that defines the --
10 the width of the damage on the pipe.
11        I'm sorry. Ask more questions. I'll --
12 I'll clarify.
13    Q.  In your opinion, does the width of the
14 scrape on the subject pipe vary?
15    A.  Not significantly. It was nominally four
16 inches.
17    Q.  And I believe we mentioned this briefly
18 today, but Crane Engineering obtained the subject
19 pipe for examination. Correct?
20    A.  Yes.
21    Q.  Did Crane Engineering obtain the subject
22 pipe from MDE?
23    A.  Yes. It was sent from MDE directly to
24 Crane Engineering with obvious chain of custody
25 paperwork and all that.

1     Q.  And how long did you all have the pipe?
2     A.  I forget. It's in our artifact records,
3  but it was I believe several weeks. And then we,
4  think, transferred it back to the Navy in California.
5  I'm not sure why it was California.
6     Q.  Was testing ongoing during the entire
7  period of time that you had the pipe?
8     A.  No, no. It's been a while, but -- but
9  generally the way inspections go is you receive the
10 artifacts.
11        You have an inspection date which we had,
12 and Mr. Curran came. We executed the protocol. I
13 believe there was some follow-up activities. Some of
14 the analyses were fairly labor intensive, so they may
15 have taken two or three days to complete.
16        And then generally, we like to keep the --
17 the artifact in our artifact storage until we know
18 we're done. So wait for the results to come back in,
19 you digest them, and make sure you've done everything
20 that you said you were going to do in the protocol.
21        And then once your -- your -- you have all
22 the results and everything, you have everything, then
23 -- then we generally either hang onto the artifacts
24 or -- or send them out. So in this case we -- we
25 sent them back to the Navy.

1     Q.  Did you measure the scrape on the subject
2  pipe during your examination?
3     A.  Yes, photographically I did with a tape
4  measure and -- and rulers.
5     Q.  Is that in your initial report, I believe,
6  this December 2011?
7     A.  It might be. I'm pretty sure the nominal
8  dimensions are given.
9     Q.  I'll hand you a copy of that report.
10       (Witness examined document)
11    A.  Let's see, 14 inches long. It's on page
12 three, the fourth paragraph from the top. I describe
13 it as 14 inches long and approximately 4 inches wide
14 as shown in figure five.
15       And so figure five has a picture of the
16 pipe with a -- scale overlaid.
17    Q.  And do you recall did you measure the
18 width of the scrape at only one location or at
19 multiple locations?
20    A.  There's some variation along the length.
21       You know, on figure six you can see some
22 variation which may have to -- you know, it -- it's
23 likely that this, you know, the original equipment
24 that did the damage wasn't perfectly aligned with
25 this pipe, and -- and impinged on it perfectly at the

Page 102

1    -- the apex of the pipe.
2          It might have been off center, so you
3    would expect some variation in width just depending
4    on how the -- the pipe is deflecting underneath the
5    indentation.
6          Q.  And ---
7          A.  --- But -- but -- but again, the -- the
8    critical feature is that you have a, you know, this
9    -- this trough with very well defined boundaries.
10         So you had 75 percent material,
11   approximately, removed in the middle, and then a step
12   up, and then nothing.
13         So it -- it's -- you went from pristine
14   pipe down to 75 percent.  So there wasn't any diffuse
15   transition between damaged and undamaged.
16         Q.  And I'll hand you an accident
17   reconstruction analysis report ---
18         A.  --- Uh-huh.
19         Q.  --- From September 19th, 2012.
20         And I believe you testified earlier today
21   that you have seen this report and you reviewed it in
22   preparation for your deposition today?
23         A.  Yes.
24         Q.  On page 10 of this report ---
25         A.  --- Do you mind if I use my own copy?

Page 103

1          Q.  Oh, not at all.
2          A.  Page 10?
3          Q.  On page 10 under examination of the
4    subject damaged pipe section.
5          At the end of the first paragraph, Dr.
6    Manning and Mr. Wenzel report that the width of the
7    scrape range from approximately three inches to four
8    and a quarter inches.
9          A.  Uh-huh.
10         Q.  Do you see that?
11         A.  Yes.
12         Q.  Do you have any reason to dispute those
13   measurements?
14         A.  It depends on -- on where you -- where you
15   measure, so I'm not sure where they measured the --
16   the -- the three inches.
17         So I'm looking at figure 13 from my
18   December 29th, 2011, report, so you know, did they
19   measure the scraping up here to be three inches?
20         What I refer to is -- is the general width
21   of the bulk of the damage, which is, I don't know, 80
22   percent of the length of the -- of the scrape.
23         This 80 percent of the length is -- is well
24   defined at nominally four inches.  Whereas, you know,
25   maybe the -- the three inches was -- was up here

Page 104

1    where the bucket just started to come into contact.
2          You know, sort of either at the beginning
3    or the end where -- where it's either making contact
4    or -- or starting to lose contact from the -- during
5    the stroke of the -- of the bucket.
6          Q.  So ---
7          A.  --- What -- what I did was essentially lay
8    my scale kind of across this bulk damage area, and
9    that's nominally four inches.
10         Q.  So the bulk damage area that you refer to
11   does not include the -- the very beginning part of
12   the scrape and the very end part of the scrape?
13         A.  And -- and -- right.
14         Q.  Is that a fair characterization?
15         A.  Right.  Right.  And -- and you know, the
16   -- you know, the bucket or the excavator that was
17   operating at the time, if it was an excavator.  But
18   the mechanical equipment that was operating at the
19   time the subject damage was done, it may not have
20   been, you know, on level ground or -- or
21   perpendicular here.
22         It may have -- you know, the -- the tooth
23   may have contacted it at, you know, one -- one side
24   of the tooth -- one corner of the tooth may have
25   contacted before the other tooth came down, until

Page 105

1    finally when it -- it actually dug into the pipe and
2    -- and did the bulk of the damage here.
3          So it's clearly -- I mean, I think there
4    were scrapes here sort of as the -- as the tooth came
5    down leading into the -- the bulk of the damage.
6          Q.  And when you say there are scrapes here,
7    just for the record, you're pointing to figure 13 on
8    page 19 of your December 29th, 2011 report.
9          And you were pointing to the portion of
10   the pipe right above the blue tag that says item 3-1.
11   Correct?
12         A.  Yes.  And in the -- the -- the photo
13   doesn't -- isn't that clear in this copy.  But I do
14   recall at -- at both ends there were apparent
15   scratches, but without any -- any real material loss,
16   not like in the middle here.
17         So -- so it's scratches to the original
18   surface -- outer surface of the pipe.
19         Q.  Those scratches that we're referring to,
20   what do you attribute them to?
21         A.  Just the -- the points of initial contact.
22   Because, again, how an excavator works, it's sort of
23   a scooping motion.  So it's coming down and -- and --
24   and so here it's sort of kissing the surface.
25         But -- but then further on in the stroke

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 8 of 21

Page 106

1    it's digging deeper and deeper, or applying more
2    force to the top of the pipe.
3        Q.  So if we look at the -- the damage as a
4    whole, there is some variation in the width of the
5    scrape. Correct?
6        A.  Right. And -- and I guess at some level
7    there's an effect of, you know, the -- the tooth has
8    a finite width. And -- and the point of initial
9    contact is probably at one point because you haven't
10   depressed it.
11          So you -- you know, you make contact and
12   as it goes deeper and deeper, the -- the contact area
13   increases, because you're flattening down the top of
14   the pipe, so....
15       Q.  The variation and the width supports a
16   change in pressure. Right?
17       A.  At least initially and -- and towards the
18   end, yes. But -- but the -- the sort of -- the
19   middle 80 percent is -- is relatively uniform, again,
20   with -- with this very clear transition from -- from
21   damage to no damage.
22          You don't see that variation that you saw
23   from the testing with the -- the straight edge, which
24   gave you this diffuse crushing deformation. But --
25   but the boundaries of it kind of wandered depending

Page 107

1    on the force.
2        Q.  We started talking about the testing that
3    you had done I believe before you issued your first
4    report.
5          Is that an accurate characterization of
6    the time, the destructive testing?
7        A.  Right, yes.
8        Q.  Okay, I'd like to ask you a little bit
9    more about that just to get a feel for what you did.
10         Were there several tests that you did on
11   the subject pipe?
12       A.  Well, I guess if you include in tests, you
13   know, visual and microscopic observation then yes,
14   there multiple tests.
15         So we have, obviously, visual observation.
16   We have digital photographs. We have digital light
17   microscope photographs.
18         We have scanning electron microscope
19   images as well as chemical data, because the SCM --
20   you get both visual information -- but also chemical
21   information. So what -- what are the fibers composed
22   of, what, you know, contaminants or -- or such do you
23   see.
24         We made some polished cross sections, so
25   we -- we -- after we cut out -- so this figure 13

Page 108

1    showing the blue tabs. These -- these tabs
2    identified areas from which we extracted coupons for
3    further analysis, mainly to look at the cross
4    section.
5          You know, where -- where were the fibers
6    terminated? Were there deep delaminations between
7    the -- the fiber layers, things like that, so -- so
8    these -- these coupons were cut out so we can get a
9    -- kind of a cross sectional view of the damage.
10   This one?
11       Q.  I'll find it eventually.
12         Do you feel as though your December 29th,
13   2011 report encompasses all the conclusions that you
14   draw -- have drawn from the destructive testing?
15       A.  Certainly with respect to the type of
16   object that could have caused that damage, I think
17   this encompasses those conclusions.
18         But if we sort of -- get further down into
19   the weeds of -- of -- of more of the details, you
20   know, there's been some discussion of -- of the sand
21   or debris that we found between the fibers.
22         Those could be characterized further to --
23   to understand is it truly sand that we see there or
24   is it -- is it clay? But that analysis hasn't been
25   done yet.

Page 109

1          So clearly, there -- there are more -- I
2    think more opinions to be had if we pursued it. But
3    to me the -- the -- the prime takeaway is that this
4    -- this damage could have only been caused by this
5    well defined tooth like contact versus a -- a -- you
6    know a straight edge.
7        Q.  And what I'd like to do is without going
8    point by point through your initial report, just
9    touch on some of the elements that you discuss that
10   supports that theory.
11         And I'd like to start with in your
12   opinion, where is the pothole in relation to the
13   damaged pipe?
14       A.  It's -- it's my understanding up to six
15   feet removed from it based on -- on I guess the
16   various statements made, and I guess primarily by the
17   two town employees and the Amec person, Gabe
18   Gallegos.
19       Q.  Mr. Gallegos and Mr. Yosay were Talon
20   employees. So are those the statements you're
21   referring to?
22       A.  Or -- right, but who is the Amec? Is it
23   ---
24       Q.  --- Brock Trubiano.
25       A.  Thank you. Brock.

## Page 110

1  Q. Okay, and your understanding of the
2  pothole location in relation to the damaged pipe,
3  you're relying on the statements of Mr. Gallegos, Mr.
4  Yosay and Mr. Trubiano?
5  A. Certainly, yes, and I'm thinking are there
6  more.
7  Certainly I -- I put a lot of weight into
8  the -- the description of the actual activities that
9  took place, you know, witnessed by several people of
10  digging down -- after the incident occurred.
11  Digging down, finding the pipe, but not
12  finding damage. Digging in one direction and -- and
13  -- and then not finding anything, and digging in
14  another digging direction, and then ultimately
15  finding the pipe.
16  To me that's -- that's -- that's powerful
17  testimony compared to someone taking two photographs
18  from two different times, from two different vantage
19  points, and then inferring three-dimensional position
20  and space from -- from a two-dimensional photograph.
21  I -- I -- you know, I know of no sort of
22  scientific or -- or, you know, some rigorous process
23  by which you can extract a three-dimensional location
24  and space by looking at, you know, drawing lines on a
25  two-dimensional photograph.

## Page 111

1  So I know there's been discussion and
2  effort to -- to say that, yes, the -- the pothole and
3  the damage are one in the same. But the actual
4  description of how that damage was -- was discovered
5  is at odds with this attempt to -- to make them one
6  in the same.
7  Q. Mr. Pfaendtner, are you familiar with the
8  designs -- the design drawings that were prepared for
9  this project?
10  A. I have seen them and they're -- they're
11  not so legible. So there's I -- I think limited
12  information that can be drawn from them.
13  Q. But you have had an opportunity to review
14  them?
15  A. Yes.
16  Q. I'm going to hand you what we'll mark as
17  Exhibit 4 and this is sheet M07.
18  (* Exhibit 4 was marked *)
19  Q. Have you seen sheet M07 before?
20  A. I've seen a -- a smaller version of it.
21  Q. It would be nice if we had full-size
22  sheets. But I want to first draw your attention to
23  this shaded portion in the upper left-hand corner.
24  A. Right.
25  Q. Do you know what that shaded portion is?

## Page 112

1  A. I believe that to be an area of -- of --
2  of construction where the new pipe -- steel pipeline
3  is being laid. And I think it's -- I think
4  essentially what's called a a -- or referred to as the
5  tarmac area joining these two larger paved areas.
6  So it's essentially the -- the -- the
7  existing pavement was removed in the strip and then
8  dug down to lay the new pipe.
9  Q. Okay, so the shaded portion is the tarmac.
10  Right?
11  A. Right.
12  Q. Okay. And then this area, it's difficult
13  to describe, but down below a lot of these lines, do
14  you know what type of material, if any, was there?
15  A. Well, it's -- it's all based on
16  photographs, but ---
17  Q. --- Uh-huh.
18  A. --- My recollection of the photographs is
19  that there were grassy areas, dirt areas, some --
20  maybe some trenches with water in them. I don't know
21  if it was a creek or anything, but -- but there was
22  water, you know, trenches with water in the area.
23  Q. Okay. Do you feel like it's fair if we
24  just refer to this area as the grassy area?
25  A. Sure.

## Page 113

1  Q. Now, the thick dotted line, do you see
2  that?
3  A. Yes.
4  Q. That shows the location of the new pipe.
5  Correct?
6  A. Correct.
7  Q. And there is a point where that new pipe
8  will turn or change location. Correct?
9  A. Yes.
10  Q. And that new point where the new pipe will
11  turn or change locations is station 13407. Correct?
12  A. Yes.
13  Q. All right. Now, there is a thin solid
14  line above the thick dotted line.
15  Do you see that?
16  (Witness examined document)
17  A. Thick solid line. Can you show me on
18  yours?
19  Q. Sure. Let's see, a thin solid line that
20  runs above the thick dotted line.
21  A. Okay. Well, it's not solid though, it's
22  still dashed, at least to my eyes it is.
23  Q. Fair enough.
24  A. Okay. Yes. Right.
25  Q. Is that -- that line that -- has a longer

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 10 of 21

Page 114

1    dash ---
2        A.   --- Uh-huh.
3        Q.   --- That's thinner, is that the new
4    pipeline that's going to be installed?
5        A.   No, that's -- I understand that to be the
6    existing fiberglass line.
7        Q.   Okay.   All right, so we've got the new
8    line that's going to be installed.
9            We've got the existing line, and this page
10   shows where the two cross over.   Correct?
11       A.   Yes.
12       Q.   Okay.   And that is -- the two lines cross
13   over just north and west of 13407.   Is that correct?
14       A.   Yes, just north and west of the -- the
15   bend in the new pipeline.
16       Q.   Now, Mr. Pfaendtner, are you familiar with
17   how the pipe was installed on this project?
18       A.   The new or the old pipe?
19       Q.   The new pipe.
20       A.   No, I -- I really saw no documents other
21   than these plan views of -- of -- of its location.
22       Q.   Okay.   You had testified a few moments ago
23   that it was your understanding that the new pipe had
24   to be laid underneath the tarmac.   Correct?
25       A.   Yes.

Page 115

1        Q.   Okay.
2        A.   Well, certainly, it's a buried pipe.   I
3    know that much.
4        Q.   Fair enough.
5            All right, let me show you what we'll mark
6    as Exhibit 5.
7            (* Exhibit 5 was marked *)
8            (Witness examined document)
9        Q.   And on Exhibit 5 we can see the tarmac.
10   Correct?
11       A.   Right.
12       Q.   And we can also see what looks to be that
13   grassy area that we talked about.   Correct?
14       A.   Well, what's left of it.
15       Q.   And we can see the damaged area of the
16   pipe.   Correct?
17       A.   Yes.
18       Q.   And we can see a red marker at the bottom
19   of the page.   Correct?
20       A.   Yes.
21       Q.   Now, in the photograph we can also see
22   that the tarmac, a section of it has been cut away?
23       A.   Yes.
24       Q.   And that presumably the new pipe will be
25   laid in the center of that cutaway portion of the

Page 116

1    tarmac.
2        A.   If you say so.
3        Q.   I'll -- I'll represent to you that Mr.
4    Williamson testified to that effect.
5        A.   Okay.
6        Q.   Now, the red marker, does the red marker
7    show where station 13407 would be?
8        A.   I don't know.
9        Q.   Looking at the photograph in conjunction
10   with Exhibit 4, does it appear that the red marker
11   shows where station 13407 would be?
12       A.   That's possible.   I -- I don't know.
13       Q.   And station 13407 we already established
14   shows where the new pipe would change direction at
15   about a 45 degree angle.   Correct?
16       A.   Yes.
17       Q.   So if the red marker is indeed 13407, that
18   it would show where that new pipe changes direction
19   at a 45 degree angle?
20       A.   Uh-huh.   Okay.
21       Q.   And so the new pipe would be going from
22   that red marker up through the center of the cutout
23   in the concrete.   Correct?
24            MR. REICH:   Objection to the form of
25   the question.

Page 117

1            You can answer.
2            THE WITNESS:   Repeat that, please.
3        Q.   (Ms. Gavalier)  The -- the new pipe would
4    run from the location of the red marker up through
5    the cut in the concrete of the tarmac.
6            MR. REICH:   Objection to the form of
7    the question.
8            THE WITNESS:   So are you asking if
9    the -- the new pipe goes from the stake right down
10   the middle of the -- the -- of this cut?
11           MS. GAVALIER:   Correct.
12           THE WITNESS:   That's certainly
13   possible, yeah.
14       Q.   And if the pipe were to go from the red
15   marker up through the middle of the cut in the
16   tarmac, it would go over the damaged area of the
17   pipe.   Correct?
18       A.   Umm, not necessarily.   It looks like the
19   damage is off -- off to the side of -- of this -- of
20   this cut in the tarmac.
21           Again, since we're -- we're looking -- the
22   pipe's down in a hole and we're comparing a -- a
23   stake that's on the surface and the cut in the tarmac
24   that are on the surface, and you're -- and you're
25   trying to line up damage that's -- that's several

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 11 of 21

Page 118

1      feet down. And it -- it doesn't work that way.
2           My interpretation is that the center of
3      this is probably over here to -- to one side of -- of
4      that repair to -- to line up with this -- with this
5      -- with the tarmac, the center of the tarmac.
6           So again, back to this -- this comparison
7      of photographs, he can't do it. You -- you can't
8      take two points on the surface and -- and -- and then
9      relate a -- a three-dimensional point of -- of
10     something out of that plane. You -- you -- you just
11     can't do that.
12          So if -- if you're trying to use this
13     photograph to demonstrate that the pothole and this
14     damage are one and the same, you -- you can't do it,
15     especially a pothole that's only six feet away from
16     the damage.
17          It's like you -- you can sort of put your
18     thumb in the air and say, yeah, you know, this
19     encompasses a 15-foot area. The pothole and the
20     damage are in the same 15-foot area, but I -- I
21     wouldn't go beyond that in -- in -- in drawing
22     conclusions from -- from this -- from a photograph
23     like this because it doesn't stand up to -- to any
24     kind of engineering or -- or technical rigor.
25     Q.   So it is your testimony that the damaged

Page 119

1      area of the pipe is not in the path from the red
2      marker to the cut in the concrete in the tarmac.
3      A.   Well, it might be in the path to maybe one
4      edge of the -- the cut in the concrete over here on
5      the -- on the left.
6           But it certainly doesn't look like it
7      lines up with the middle of the -- if -- you -- you
8      represented to me that the -- that the new pipe is
9      going down the middle of this cut in the tarmac.
10          And then, to me, it doesn't look like they
11     -- they line up, again, because -- because the pipe
12     is several feet below the surface.
13     Q.   Now, how many feet below the surface is
14     the pipe?
15     A.   I think between four and four and a half
16     feet. At least that's what I -- I read. So -- so to
17     really know where that damage is with respect to that
18     stake and this -- this cut area, you have to survey
19     it.
20          You need to get a -- a -- a true surveyor
21     out there to understand, especially if you're talking
22     about matter -- a matter of feet, six feet. You --
23     you simply can't judge that from -- from a
24     photograph. It has to be surveyed.
25     Q.   Do you know why Talon was potholing in

Page 120

1      this vicinity on the day of the fuel release?
2      A.   I -- I think to physically locate the pipe
3      and to -- to document its elevation.
4      Q.   And do you know why Talon was trying to
5      identify or document the location of the pipe?
6      A.   Well, I -- I understand they're doing that
7      at various points along the length of the -- the
8      existing fiberglass pipe just so that they can
9      confirm its -- its location at various points.
10     Q.   Would it be important to identify the
11     location of the existing pipe at the point where the
12     new pipe will cross over or under it?
13     A.   I -- I can imagine, yes, that would be
14     important.
15     Q.   Do you know if Talon was tasked with
16     identifying the location of the existing pipe where
17     the new pipe would cross it?
18     A.   I -- I don't know that. I don't know how
19     they were assigned their potholing locations.
20     Q.   Have you reviewed Talon's contract with
21     Structural Associates?
22     A.   I don't know if I have that.
23     (Witness examined documents)
24     A.   I -- I don't recall ---
25     Q.   --- Okay.

Page 121

1      A.   --- Whether I've seen it or not.
2      Q.   Have you seen Structural Associates'
3      contract with Amec?
4      A.   I don't believe I've -- or I -- I don't
5      recall seeing one.
6      Q.   Okay. Mr. Pfaendtner, marker tape was
7      found in the excavation area. Correct?
8      A.   Yes, I -- that's what I -- I read.
9      Q.   Was the marker tape intact?
10     A.   Well, intact where? I -- I understand it
11     was broken where Talon had dug the hole and they
12     needed to break the tape in order to go through to
13     find the -- the pipe.
14          So at the point they -- they potholed,
15     they naturally had to break the tape. And it's my
16     understanding when they -- after the incident, when
17     they went back they found the location in which they
18     broke the tape.
19     Q.   Did Talon replace the tape where it had
20     been broken?
21     A.   I -- I don't know that. But -- but it
22     would -- I ---
23     Q.   --- Is it a customary practice to replace
24     the tape if you've had -- if you have to break it?
25     A.   I don't know that.

Page 122

1  Q. Is broken marker tape necessarily
2 indicative that a prior excavation had been
3 performed?
4  A. Not necessarily. If -- if -- and, again,
5 I don't know what practices -- exact practices are.
6 But if work is done and you uncover a pipe or know
7 that a pipe is there, you -- and -- and -- and it's a
8 permanent installation, that you'd somehow replace
9 the -- the marker tape so you can find it in the
10 future.
11  Q. In fact we have no information that prior
12 excavation work had been performed at the site of the
13 damaged pipe. Correct?
14  MR. REICH: Objection to form and
15 characterization.
16  THE WITNESS: Well, there -- the --
17 the records haven't been produced. So it -- it's
18 uncertain to me what -- what work has been done
19 anywhere.
20  So -- and -- and generally with -- with
21 construction, I understand that the records --
22 they're -- they -- they are recorded. So I -- I've
23 seen nothing that says that work was done or -- or
24 says -- or proves that no work was done, because the
25 records haven't been produced, to my knowledge.

Page 123

1  Q. (Ms. Gavalier) Have you sought to obtain
2 the records at -- pardon me.
3  Have you sought to obtain the records of
4 prior excavation work that had been done at this area
5 of the damaged pipe?
6  A. It's certainly a -- a discussion that I --
7 I've had with -- with my clients of where -- where
8 are these records, because in our work at Crane
9 Engineering we -- we deal quite a bit with
10 underground utilities, whether it's water or gas, and
11 -- and in all instances the records do exist. So --
12 so I'm -- I'm -- I'm baffled that those records
13 haven't been produced. And then if -- if the records
14 are produced and it shows up no work has been done,
15 then -- then that -- that would be more satisfying
16 than no records at all.
17  And then to that point, what suggests that
18 work had been done is -- is the physical evidence of
19 no sand, whereas I understand Talon, at all previous
20 potholes they encountered sand around the pipe,
21 whereas here no sand was -- was encountered.
22  So that leads me to believe that something
23 was done, because why would the original installer of
24 this pipe change their installation method,
25 especially when it's in violation of -- of -- of how

Page 124

1 a pipeline is supposed to be installed.
2  Q. Have you recommended that the records
3 relating to any prior excavation work at the area of
4 the damaged pipe be obtained?
5  A. I -- I -- I think in a past phone call
6 with my clients that it was -- it was discussed that,
7 yes, we -- if -- if -- if a claim is being made that
8 -- that no work had been done, we ought to request
9 those -- those documents.
10  Q. To your knowledge, the documents have not
11 been requested to date?
12  A. I -- I don't know. Certainly they haven't
13 been produced, at least not -- not to me.
14  Q. And in your experience, excavation work
15 like what we're dealing with in this case would be
16 recorded or documented in some manner?
17  A. Yes. You know, I -- we deal mostly with
18 municipalities. And in all cases, I mean, they have
19 records going back a century of what went where. So
20 I -- I -- I can't imagine the -- the U.S. government
21 would be any less stringent in their -- in their
22 record keeping than -- than a municipality.
23  Q. You mentioned a moment ago that it's your
24 opinion that the lack of sand as backfill around the
25 pipe is an indication of prior excavation work.

Page 125

1  Did I say that correctly?
2  A. Well, it -- it's -- it's one of two
3 things. One, it's there was work done subsequent to
4 the initial installation and it was in -- it was
5 backfilled improperly, or the initial installation
6 was done improperly would -- and the latter which I
7 find less likely than -- than to some -- simply a
8 contractor was there digging for something, whether
9 it's -- it's laying power for these lights on the
10 tarmac or -- or the new vault or something, that --
11 that there was activity digging there.
12  Q. You mentioned this a minute ago, and you
13 also mentioned it in your initial report, that the
14 other areas in which Talon potholed, a sand bed was
15 found in those areas. Is that correct?
16  A. Yes.
17  Q. And on what do you base that statement?
18  A. Umm, I think statements made by Mr.
19 Williamson, so by -- by Talon.
20  Q. And are those in conversations that you've
21 had with Mr. Williamson?
22  A. Well, early on in conversations with Mr.
23 Williamson, but then also I think that observation
24 was memorialized in an e-mail. So one of the e-mails
25 in the file says that. I think on -- on every prior

Page 126

```
 1   pothole sand was -- sand was encountered except for
 2   this one.
 3        Q.  We've talked about Gabe Gallegos, who I
 4   believe was Talon's superintendent on the project.
 5   Does that sound correct?
 6        A.  Yes.
 7        Q.  Okay, and you have testified that you have
 8   read his statements.  Correct?
 9        A.  Yes.
10        Q.  But you have not read his deposition
11   testimony.  Correct?
12        A.  I don't think I have his deposition.
13        Q.  Okay.  I'm going to hand you his
14   testimony.  And I recognize that you certainly cannot
15   read it at length with us today.  But I'd like to
16   direct you to a couple of sections where he discusses
17   the backfill.
18        A.  Okay.
19        Q.  If you'll turn first to page 38.  And I --
20   probably the easiest way is just to read page 38, 39,
21   and 40 to yourself.
22        A.  Okay.
23        (Witness examined document)
24        A.  Okay.
25        Q.  Okay.  On page 39, line four, the question
```

Page 127

```
 1   was asked the other areas that were potholed, did you
 2   find the cushion sand or was it all hard dirt.
 3        Answer.  Some spots had it, some didn't.
 4        Question.  So it was just sort of
 5   sporadic.
 6        Answer.  Yeah.  It wasn't consistent.
 7        So does Mr. Gallegos indicate that both
 8   sand and clay were found at the potholing location?
 9        A.  I don't think he mentions clay, but
10   certainly it -- it sounds like there were other soils
11   encountered other than sand.
12        Q.  Okay, and if you will turn to page 49, and
13   if you'll just read page 49 and 50 to yourself.
14        (Witness examined document)
15        A.  So just through the end of 50?
16        Q.  Yes, sir.  And on page 49, beginning at
17   line 20, the question is asked of Mr. Gallegos, if
18   you were to venture a ballpark estimate of what
19   portions of the pipeline had the cushion sand and
20   what was just sort of exposed to the hard clay, what
21   would you estimate.
22        Answer.  The areas that we uncovered.
23        Question.  Yes.
24        Answer.  Oh, well, I don't know.
25        Question.  Just your best recollection.
```

Page 128

```
 1        Answer.  I'm going to say maybe 60 percent
 2   had sand, 40 didn't.
 3        Question.  So it was close to even.
 4        Answer.  No, 60-40.
 5        So Mr. Gallegos is indicating that
 6   approximately 60 percent of the areas that Talon
 7   excavated had clay.  Correct?
 8        MR. REICH:  Objection to the form of
 9   the question.  Objection, characterization.
10        THE WITNESS:  Sixty percent had
11   clay?  Is that what you said?
12        I think you said 60 percent ---
13        MR. REICH:  --- That is what counsel
14   said.
15        THE WITNESS:  He ---
16        MS. GAVALIER:  --- I ---
17        THE WITNESS:  --- He said 60 percent
18   had sand, 40 percent didn't.  So my -- my -- I assume
19   40 percent had something other than -- than the brown
20   sand that he -- that he called the cushion.
21        MS. GAVALIER:  Thank you for the
22   clarification.
23        Q.  (Ms. Gavalier)  So in your December 29th,
24   2011, report where you indicate that a sand bed was
25   found in the other areas in which the potholes were
```

Page 129

```
 1   dug, that is not a correct statement, is it?
 2        A.  It was based on information that I had at
 3   the time.  Although partially true, it -- it seems
 4   that -- that the majority of them were -- had sand in
 5   them, yes.
 6        Q.  Sixty percent had sand.  Correct?
 7        A.  Umm, yes, according to Mr. Gallegos.
 8        Q.  After reading Mr. Gallegos' testimony,
 9   would you still make the statement a sand bed was
10   found in the other areas in which the potholes were
11   dug?
12        A.  I'd make the statement that sand was found
13   in some of the potholes.
14        Q.  Do you have an explanation as to why 40
15   percent of the potholes dug did not have a sand bed
16   as backfill?
17        A.  I can speculate.  The -- the -- the pipe's
18   been underground since 1984.  I understand that there
19   were leaks in it.
20        So there could have been multiple repairs
21   or excavations done over the lifetime and then just
22   improperly backfilled, or unlikely case would be that
23   the -- that the installer buried sand and buried the
24   backfill, which seems unlikely given I am going on
25   the assumption that the pipeline was installed in --
```

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 14 of 21

Page 130

1   in one contract, in one job.
2       Q.  But the pipe as it was found in the course
3   of Talon performing its work is embedded in various
4   types of materials.  Correct?
5       A.  Yes.
6       Q.  So is the presence of clay at the area of
7   the damaged pipe necessarily indicative of prior
8   excavation?
9       A.  I'd say it's still an indication of prior
10  excavation, but I -- I will certainly leave out -- or
11  -- or won't leave out the possibility of the initial
12  installation having -- I don't know why they'd do
13  this, but they would vary their practice from one
14  place -- location to the next.
15          So I'm -- I'm still of the belief that,
16  you know, given a -- a pipeline of this age, that
17  there were multiple excavations.
18          And maybe if -- if the potholing were done
19  at prescribed locations, maybe that has something to
20  do with -- with locations of prior repair.  I don't
21  know.
22      Q.  But we have no evidence of prior
23  excavations -- correct -- in the area ---
24      A.  --- Well, again ---
25      Q.  --- Of the damaged pipe?

Page 131

1       A.  --- Those documents haven't been produced.
2   But, again, my -- my engineering sense tells me that
3   if you see differences like this, that something was
4   done since its original installation, because I -- I
5   -- I can't imagine why there'd be variation in -- in
6   burying a pipe on -- on this facility, why -- why
7   there'd be specific changes, especially out of clay,
8   which is certainly not one of the -- the recommended
9   backfills, you know, recommended.
10          What's recommended is -- is sort of
11  well-classified, non-native soils be used, whether
12  it's pea gravel or -- or sand, things that are well
13  characterized, whereas, you know, the -- the -- the
14  clay doesn't really belong in that category as do the
15  -- the -- the -- the rocks that we saw in -- in the
16  -- in the trenches there.
17          So it certainly seems unlikely that this
18  clay would have been present from the very beginning.
19  But -- but to me it -- it's -- it -- it's -- it's not
20  so important a point because maybe -- maybe the
21  damage was done at the very beginning when the pipe
22  was being laid.
23      Q.  Well, the clay backfill is the one thing
24  that you point to to suggest that excavation work was
25  done at an earlier time.  Correct?

Page 132

1       A.  Yes.  But it -- it's not a -- a central
2   tenant of -- of -- of my opinion.
3       Q.  Your opinion is that the damage to the
4   pipe was caused at some point before Talon worked on
5   the project.  Correct?
6       A.  Yes, absolutely.
7       Q.  And so if no excavation work had been done
8   since the time of installation, then that damage
9   would have had to occur at the time of installation.
10      A.  Correct.  Which ---
11      Q.  --- But you don't know ---
12      A.  --- My understanding ---
13      Q.  --- Who installed the original pipe.
14      A.  No.  But I -- I know -- I know ---
15      Q.  --- And you don't know how the original
16  pipe was installed.
17      A.  I know it wasn't Talon.
18      Q.  Mr. Pfaendtner, do you have any opinions
19  that relate to the fracture pattern on the fiberglass
20  pipe?
21          And I'll qualify that with aside -- we
22  don't need to go back over anything that we've talked
23  about already today.
24          But is there anything else that relates to
25  the fracture pattern that you rely on in forming your

Page 133

1   opinions?
2       A.  I think we've dis -- covered it.
3       Q.  Okay.
4       A.  Again, unless you get down into the weeds
5   of how the -- the soil got between -- way down deep
6   inside the -- the laminates, which I know is -- is --
7   was discussed in my first report and I think rebutted
8   by -- by Mr. Manning.
9       Q.  And if I recall correctly, it's your
10  opinion that the -- those -- or that soil settled
11  into the crevices over the period of time that the
12  pipe had been damaged.  Correct?
13      A.  Yes.
14      Q.  In your opinion, did the Talon excavator
15  drive over the crossover point?
16      A.  I -- I don't know that.  Certainly there
17  was heavy equipment in that immediate vicinity.
18      Q.  Do you have an opinion on whether the
19  Talon excavator drove over the crossover point?
20      A.  It's certainly plausible.
21      Q.  Have you done any calculations to
22  determine the force or the pressure that the
23  excavator may have exerted on the pipe?
24      A.  Umm, no, other than to say that I've
25  reviewed the -- the MDE calculations with the

Page 134

1  understanding that the -- their calculations were for
2  an intact, pristine pipe, whereas it's my opinion
3  that the damage preexisted and so that any surface
4  loads would -- would have been on a compromised pipe.
5       I know Mr. Curran made some back of the
6  envelope cal -- or estimates of -- of how it was
7  compromised just based on the law loss. But those
8  things are inherently difficult to do other than to
9  -- to know that the pipe was severely compromised.
10 So clearly it -- it would not have held up to its
11 advertised rating. It would be something much less
12 than that.
13      Q. Have you reviewed Mr. Curran's
14 calculations?
15      A. Umm, I -- I think I -- I -- I did but I --
16 my -- my recollection is -- isn't so great. But I --
17 I seem to recall it was simply he -- he derated the
18 -- the capacity of the pipe just simply by how much
19 wall it had lost.
20      Q. Did you agree with his calculations, to
21 the best of your recollection?
22      A. I -- I -- I didn't really form an opinion
23 other than to recognize as a materials engineer that
24 -- that this is a -- a severely compromised pipe.
25      Q. And I don't think we need to mark this but

Page 135

1  I just want to show you what's been Bates labeled
2  05000001.
3       Are these the calculations that we're
4  referring to?
5       (Witness examined document)
6       A. I ---
7       Q. --- And I should back up. Have you ever
8  seen this piece of paper before?
9       A. It does not look familiar.
10      Q. Okay, so these are not the calculations
11 that Mr. Curran did that you're referring to.
12      A. Well, I -- I mean, I -- I need some time
13 to sit down and with a -- to -- to -- to go through
14 it. So I -- I -- I can't tell you off the cuff if
15 they are or not -- or aren't. I just don't know.
16      Q. Okay. Have you ever done calculations to
17 determine the force or pressure that an object would
18 exert on another?
19      A. I -- I've done many of those but -- but
20 not in a -- a geotechnical sense. I've -- I don't
21 know if I've ever calculated forces on -- on a buried
22 object.
23      Q. Do you feel as though you're qualified to
24 perform those calculations in a geotechnical context?
25      A. Certainly if -- if there were standard

Page 136

1  calculations. And -- and from what I understand
2  there's -- there -- you know, there's -- it's
3  essentially a handbook on -- on -- on -- on doing
4  these sorts of calculations.
5       It's, you know, how deep is the pipe,
6  what's the soil level above it, what's the traffic,
7  what's the distribution below it. And -- and there
8  are standard formulas that allow you to essentially
9  transform the surface loads into loads on the -- on
10 the pipe.
11      Q. I'm going to show you what we'll mark as
12 Exhibit 6.
13          (* Exhibit 6 was marked *)
14      Q. This is a statement from Bryan Yosay.
15 Have you ever seen this statement before?
16      (Witness examined document)
17      A. It does not look familiar.
18      Q. Okay. Take just a moment to familiarize
19 yourself with that.
20      (Witness examined document)
21      A. Okay.
22      Q. And we've mentioned Bryan Yosay several
23 times today. I believe that he was the equipment
24 operator for Talon.
25      A. Right.

Page 137

1       Q. And I believe you testified you had read
2  other statements of his.
3       A. Yes.
4       Q. Okay, but ---
5       A. --- It was not ---
6       Q. --- You had not read his deposition
7  testimony. Correct?
8       A. I have not read his deposition testimony.
9       Q. In this particular statement Mr. Yosay
10 sketches the path of the excavator. Correct?
11      A. Right.
12      Q. Based on Mr. Yosay's sketch, did it --
13 does it appear that the excavator drives over the
14 crossover?
15      A. Well, his path is represented by a single
16 line, whereas the excavator has a -- a -- a --
17 certainly a -- some girth to it. So I -- I think
18 he's depicting the general path that he took. But
19 whether or not one of the tracks crossed the
20 crossover point is, you know, hard to say. I mean,
21 it's a large piece of equipment.
22      Q. It appears that the excavator would have
23 crossed the existing line around where he's labeled
24 with the number four. Is that correct?
25      A. Well, I understand that fuel pit to have

35 (Pages 134 to 137)

Page 138

1   been 30 -- what -- 30 feet from the damage,
2   thereabouts.
3         I mean, to me this -- the -- the size of
4   an excavator is -- is, you know, very much -- as much
5   -- you know, consumes a lot of that -- that 30 some
6   odd feet.
7         So again, this is a thin line, but I
8   imagine if you superimpose the footprint of the
9   excavator, it would consume a lot of this area here.
10  So I -- I view this as a schematic of -- of -- of
11  where he drove it.
12        Q.  But it doesn't appear that he drove it
13  over the crossover point.  Correct?
14        A.  Well, his line doesn't go over the
15  crossover points maybe 'cause he didn't want to
16  obliterate that crossover point on this sketch.  I
17  don't -- I don't know.
18        And, then, I -- I guess the other thing,
19  maneuvering a -- an excavator, just from -- from
20  experience watching them, is not a -- it -- it -- it
21  -- it's -- it's not a gentle thing.  These are tracks
22  and a lot of times they'll -- they'll -- they'll
23  plant the bucket in order to -- and -- and 'specially
24  in tight quarters to maneuver the -- the excavator up
25  -- so they'll -- they'll plant the bucket and

Page 139

1   actually lift the tracks up to move them over.
2         So he -- so he positioned the -- the --
3   the excavator so that he's straddling this pipe in a
4   very tight space.  So it's possible that maybe he did
5   that and planted his bucket on the crossover point.
6   But I don't know.  It -- it's certainly all
7   plausible.
8         Q.  Okay.  We can set Exhibit 6 aside.
9         Mr. Pfaendtner, are you aware of any
10  evidence of leaks in the damaged area prior to August
11  9th, 2011?
12        A.  None other than I think -- and I forget
13  where I read this in the -- in the file materials but
14  there -- there's some -- someone who stated something
15  about old fuel or plumes.
16        But I forget where -- where I read that --
17  as -- as part of the -- the overall excavation here
18  on Exhibit 5 to expose that -- that pipe, I -- I
19  understand, or at least I interpreted there to be --
20  had to have been evidence of -- of old fuel -- but --
21  but not from the -- the -- the -- the testing that
22  was done with the helium tracer.  I don't think they
23  identified this area as being -- as having leaks.
24        Q.  Okay, and I just want to make sure that I
25  understand you correctly.

Page 140

1         It's your recollection that you read
2   somewhere that -- is it following this fuel release
3   that evidence of old fuel was found during the
4   excavation?
5         A.  I -- I -- I don't want to say that
6   definitively but that's -- that's my recollection.
7   But I -- I -- I can't cite chapter and verse.  And I
8   -- and I could be wrong.  But I -- I thought the
9   testimony said that during this excavation there were
10  signs of -- of old plumes of -- may -- I guess of
11  fuel.
12        Q.  During the potholing operation, are you
13  aware of any evidence that Talon found an active
14  leak?
15        A.  I -- I don't recall.  But I -- I do
16  understand the reason for putting in the new pipe was
17  that this one was leaking or had -- had known leaks.
18        Q.  And during the potholing operation, and in
19  that area in which the damaged pipe was found, are
20  you aware of any evidence that Talon found an active
21  leak?
22        A.  Well, I think the testimony is that there
23  was no fuel encountered while they were potholing in
24  that area.
25        Q.  No fuel encountered in that area.  Was

Page 141

1   there any odor of fuel encountered in that area?
2         A.  I don't recall seeing any -- or having
3   read that there was any odor.
4         Q.  During the initial potholing operation,
5   and in that area of the damaged pipe, are you aware
6   of any evidence that Talon found an old leak?
7         A.  I have no recollection of -- of seeing
8   that -- or having read that.
9         Q.  So during the initial potholing operation,
10  we have no evidence to indicate there was a leak
11  prior to August 9th, 2011.
12        A.  I'm sorry.  Restate that.
13        Q.  During the initial potholing operation, we
14  have no evidence that indicates there was a leak at
15  the area of the damaged pipe prior to August 9th,
16  2011.
17        A.  I think that's correct.
18        Q.  Okay, so is it fair to say, then, that we
19  went from a no-leak condition on the morning of
20  August 9th, 2011 to a significant-leak condition on
21  the afternoon of August 9th, 2011?
22        A.  Yes.
23        Q.  And we had discussed earlier today that
24  from the no-leak condition to the significant-leak
25  condition, 9,000 gallons of fuel were released.

Page 142

1   Correct?
2     A.   Right.
3     Q.   So if you can explain to me the drastic
4   and immediate change in condition.
5     A.   Uh-huh.   Well, that's a good question.
6   And certainly there's this -- this issue of proximity
7   in time Talon was there with an excavator and, oh,
8   then they had a leak, so how -- how does that happen.
9     So it's an area, grass.   So -- and we know
10   we have a -- a compromised pipe.   We know we have
11   heavy equipment there -- Talon -- and so to me one
12   plausible scenario is that the existing gouge
13   compromised the pipe but did not compromise it at a
14   point of -- of leaking.   And so we have this -- this
15   clay backfill supporting the -- top of the pipe
16   on this grassy area and then along comes this heavy
17   piece of machinery.
18     So -- so you have heavy machinery in the
19   immediate vicinity of this compromised pipe, and then
20   possibly then crushing or -- or exacerbating the --
21   the damage to the pipe, thereby creating a leak path.
22   So -- so preexisting damage, heavy machinery to -- to
23   cause the -- the breach, or at least the -- to extend
24   the crack to -- to connect to the inside of the pipe,
25   and then the fuel was released.

Page 143

1     Attempt -- an attempt is made to -- to
2   transfer the fuel through the pipeline and then it --
3   it -- it bubbles up -- bubbles up along the path of
4   least resistance, which is this loosely-filled
5   pothole that was dug just hours before.
6     Q.   And under that theory, with the
7   compromised pipe, the heavy equipment, how do you
8   account for the significant fuel release?
9     In other words, if the pipe is
10   compromised, heavy equipment moves over it, explain
11   why the release would not be slower or less.
12     A.   Well, I think it just comes down to simple
13   fluid mechanics.   I don't have the answer for you.
14     But if -- if it's being claimed that it is
15   9,000 gallons of fuel coming through that small
16   crack, then I'm -- I guess I'll -- I'll believe it.
17   I -- I don't know what that would look like.   But
18   I'll -- I'll -- I'll accept that that 9,000 gallons
19   made it through that crack in the pipe.
20     Q.   It would look like five gallons a second.
21     A.   Right.
22     Q.   And that's fairly significant.   Right?
23     A.   Sure.   Out of a very small crack, yeah,
24   'cause most of the damage was still -- you know, the
25   -- pipe was still compromised.   It wasn't a -- a

Page 144

1   gaping hole in there.   It was this -- this -- this
2   small, small hole, I mean, effectively a small hole
3   through which fuel could escape.
4     But -- but, you know, the -- the -- the --
5   the -- the -- the damaged portion was much larger an
6   area than -- than the actual opening that allowed
7   fuel to -- to get out.
8     Q.   And under the theory with the compromised
9   pipe, the heavy equipment, that equipment would have
10   to exert enough pressure on the pipe -- or, rather,
11   on the ground to actually affect the pipe.   Correct?
12     A.   Absolutely, yes.
13     Q.   Do you know what the amount of that
14   pressure would have to be for the equipment to have
15   actually affected the pipe?
16     A.   No, because we don't really know what --
17   what the remaining ligaments were spanning that --
18   that damaged area.
19     But just looking at it in the inspection,
20   it looked like I could take my finger and push it
21   through.   So clearly it didn't need a lot of
22   pressure.   I -- I -- I felt like I could physically
23   just by hand poke holes in this thing.
24     And -- and in the cross-sections of the
25   damage area there are areas where there's just simply

Page 145

1   a -- there's a -- kind of one laminate of -- of
2   fibers left holding this in place.   So -- so this
3   thing was highly compromised.   So in -- in my view,
4   it -- it's not going to take much.   And if you have
5   30,000 pounds four feet away from it, then, yeah, I
6   -- I -- I could easily see -- oh, that's obviously
7   without calculation.
8     But yeah, I -- I've no problem imagining a
9   -- a -- a 30,000-pound excavator to -- to -- causing
10   the -- the -- the last straw to break on this -- on
11   this damaged area.
12     MS. GAVALIER:   I think I'm about
13   done, but if we can take about a five-minute break,
14   I'll look through everything and we can wrap up.
15     THE WITNESS:   Okay.
16     (2:49-2:56 p.m. - recess)
17     Q.   (Ms. Gavalier) Mr. Pfaendtner, I just
18   glanced at the jump drive that you gave me this
19   morning.
20     A.   Okay.
21     Q.   And unfortunately, I cannot possibly get
22   through all those materials as we sit here this
23   afternoon.   And I know that you have an evening
24   flight to catch, so in the event that we have
25   questions that come up about the materials that were

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 18 of 21

Page 146

1  produced today, then we'll just request to speak to
2  you again.
3      A.  Okay.
4      Q.  To wrap up, it's my understanding that
5  it's your opinion that the scrape on the damaged pipe
6  was caused by hydraulic equipment.  Correct?
7      A.  Yes.
8      Q.  And it's further your opinion that that
9  scrape was not caused by Talon's hydraulic equipment.
10  Correct?
11      A.  Yes, that's correct.
12      Q.  Despite the fact that Talon was potholing
13  in the vicinity of the damaged pipe using hydraulic
14  equipment on August 9th, 2011.
15      A.  Right.  But there's also hydraulic
16  equipment there on prior occasions.
17      Q.  Do you feel as though we have covered the
18  breadth of your opinions in your deposition today?
19      A.  Well, certainly I think we've covered the
20  -- my opinions.  I -- I -- I -- I guess I -- I have
21  rebuttal opinions on what Mr. Manning has said.  I --
22  I think many of them are -- of which are covered in
23  -- in -- in the -- the second report.
24      Q.  Are there any rebuttal opinions to Dr.
25  Manning that you feel are not covered in the

Page 147

1  supplemental report?
2      A.  Well -- I can -- I -- I think they're
3  mostly covered but I -- I can -- I'd be happy to
4  recap those -- those opinions.
5          You -- you know, to me, it -- it -- it --
6  it seems that, you know, at issue here is -- or -- or
7  the main argument -- plaintiff argument is one of --
8  of proximity in time to this -- this leak event.
9          But you -- you know, you know -- the -- the
10  facts relied on to come to that conclusion is -- is
11  -- are -- are -- are weak and then critical
12  information is being left out, in -- in particular
13  this idea of -- of the -- the pothole being
14  co-located with the -- the -- the damage is -- is --
15  is based on unsound science, mainly a -- a
16  photographic comparison.
17          This idea that the -- the scrape was
18  recent, I think Mr. Manning reply -- or is relying on
19  a -- a worker from -- I think it's API Plastics --
20  making a comment that it looks -- it looks fresh.
21      Q.  Uh-huh.
22      A.  But the -- the thing is this -- this pipe
23  doesn't corrode.  So you know, it's fresh maybe in --
24  in -- in geologic terms because this buried pipe just
25  isn't going to degrade like a -- a buried waterline

Page 148

1  made of iron that's going to rust.
2          So -- so here, you know, there's proximity in
3  time but there's really nothing else.  You -- you --
4  you can't say with any definitive certainty that the
5  pothole and the damage are -- are the same.  You
6  can't say that the -- the -- the -- the scrape is --
7  is -- is recent because, in -- in my view, it -- it's
8  -- there -- there -- there are no developing features
9  of this pipe that would allow you to say this scrape
10  happened now versus 10 years ago versus 20 years ago.
11  It's buried in the ground.  It's -- it's inert.  So
12  in terms of geologic time sense, yeah, it's -- it's
13  fresh.  You know, sometime between now and when it
14  was installed it -- it -- it happened.
15          And then, I guess, my -- my biggest
16  criticism is Dr. Manning's figure nine in which he
17  drew this schematic without calculation or experiment
18  or anything.  It was essentially a cartoon.  It -- it
19  -- it was created by my imagination, not without any
20  -- any rigor or engineering fundamentals.  And -- but
21  -- but in fact -- so in -- in fact figure nine is
22  incorrect.
23          Our calculations and our physical testing
24  demonstrate that it's incorrect and -- and that the
25  -- the -- the Talon bucket could not have -- have

Page 149

1  caused this damage.  The -- the -- the -- the -- the
2  bullet doesn't match the gun.
3          So Talon was there with an excavator, yes,
4  but that excavator -- that bucket wasn't capable of
5  -- of making that damage.
6      Q.  You mentioned Applied Plastic Sciences.
7  Does that sound correct as the company that repaired
8  the damage?
9      A.  Yeah, whoever made the repair, yes.
10      Q.  Okay.  I believe his name is Monroe
11  Jacobs.
12          Does that ring a bell?
13      A.  No.
14      Q.  Do you know anything about Mr. Jacobs?
15      A.  I don't.
16      Q.  Okay.
17      A.  Other than I -- certainly I -- I -- I
18  don't doubt his qualifications in -- in terms of
19  repairing fiberglass pipe.
20      Q.  You expounded on your rebuttal opinions to
21  Dr. Manning's conclusions.  Taking that into
22  consideration, and everything that we've discussed
23  today, are there any other opinions that you have
24  that we did not cover?
25      A.  No, other than those that might come about

38 (Pages 146 to 149)

Page 150

1    as -- as rebuttal to -- to further discovery.
2        Q.   Do you feel as though you've had a fair
3    opportunity to express your opinions today?
4        A.   Yes.
5            MS. GAVALIER:  Okay, I don't have
6    any further questions for you.
7            Thank you very much.
8            THE WITNESS:  Uh-huh.  Thank you.
9            MR. REICH:  No questions.
10       WHEREUPON,
11   at 3:04 o'clock p.m. the deposition was adjourned.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1            CERTIFICATE OF OATH
2        I, Connie B. Meeker, Notary Public in and
3    for the County of Guilford, State of North Carolina
4    at Large, do hereby certify that there appeared
5    before me the foregoing witness;
6        That the witness personally appeared
7    before me at the date, time and location hereon
8    captioned and was personally sworn by me prior to the
9    commencement of the proceeding in the matter hereon
10   captioned.
11       IN WITNESS WHEREOF, I have hereunto set my
12   hand this the 19th day of May, 2014.
13               Connie B. Meeker
14               Court Reporter
15               Atlantic Professional Reporters
16               Post Office Box 11672
17               Winston-Salem, NC 27116-1672
18
19
20
21
22
23
24
25

Page 151

1            CERTIFICATE OF TRANSCRIPT
2        I, Connie B. Meeker, Notary Public in and
3    for the County of Guilford, State of North Carolina
4    at Large, do hereby certify that there appeared
5    before me the foregoing witness;
6        That the testimony was duly recorded by
7    me, reduced to typewriting by me or under my
8    supervision and the foregoing consecutively numbered
9    pages are a complete and accurate record of the
10   testimony given at said time by said witness;
11       That the undersigned is not of kin nor
12   associated with any of the parties to said cause of
13   action, nor any counsel thereto, and that I am not
14   interested in the event(s) thereof.
15       IN WITNESS WHEREOF, I have hereunto set my
16   hand this the 19th day of May, 2014.
17               Connie B. Meeker
18               Court Reporter
19               Atlantic Professional Reporters
20               Post Office Box 11672
21               Winston-Salem, NC 27116-1672
22
23
24
25

Page 153

1            WITNESS CERTIFICATION
2        I, JEFFREY ALAN PFAENDTNER, hereby certify:
3        That I have read and examined the contents of
4    the foregoing testimony as given by me at the time
5    and place hereon indicated, and;
6        That to the best of my knowledge and belief,
7    the foregoing pages are a complete and accurate
8    record of all the testimony given by me at said time,
9    except as noted on the Attachment A hereto.
10   I have ___ have not ____ made
11   changes/corrections _____
12               Jeffrey Alan Pfaendtner
13       I,_____, Notary Public for the
14   County of _____, State of _____,
15   hereby certify:
16       That the herein-above named appeared before me
17   this the _____ day of _____, 19____, and;
18       That I personally witnessed the execution of
19   this document for the intents and purposes as herein-
20   above described.
21
22               _____
23               Notary Public
24   My Commission Expires:
25   _____        (SEAL)

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 20 of 21

Page 154

1                    ADDENDUM A
2        Upon reading and examining my testimony as
3   herein transcribed, I make the following additions,
4   changes and/or corrections, with the accompanying and
5   corresponding reason(s) for the same:
6
7   Page  Line         Is Amended to Read
8        |     |
9        |     |
10       |     |
11       |     |
12       |     |
13       |     |
14       |     |
15       |     |
16       |     |
17       |     |
18       |     |
19       |     |
20       |     |
21
22       _____
23       Jeffrey Alan Pfaendtner
24
25

Page 155

1             CERTIFICATE OF MAILING
2        I, Cassandra J. Stiles, CVR, do hereby certify
3   that a true copy of the transcription of the matter
4   hereon captioned was served on the party named below
5   by the placement of said transcript copy in the
6   United States Mail, Priority Mail delivery, with
7   proper postage affixed, addressed as follows:
8
9
10  Jeffrey Alan Pfaendtner
11  c/o Jonathan Reid Reich, Esq.
12  WOMBLE CARLYLE SANDRIDGE & RICE LLP
13  One West Fourth Street
14  Winston-Salem, NC 27101
15
16  This the 20th day of May, 2014.
17
18
19       _____
20       Cassandra J. Stiles, CVR
21
22
23
24
25

Case 7:13-cv-00021-BO   Document 71-4   Filed 06/12/14   Page 21 of 21